THE LIN LAW FIRM
   A PROFESSIONAL LAW CORPORATION
ELIZABETH P. LIN (SBN 174663)
2705 S. Diamond Bar Blvd.
Suite 398
Diamond Bar, CA 91765
Telephone: (909) 595-5522
Facsimile: (909) 595-5519
Elizabethl@thelinlawfirm.com

Counsel for the Plaintiffs

FILED

2012 JUL -3 PM 2: 48

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

**VIA FAX**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD D. ALLEN JR., RAYMOND BOZIGIAN, ALEXANDRA M. CASTOR, KEITH DENVER, MILTON DENVER, JESSICA FLOREZ, ANTHONY FREEMAN, MIKKI A. GRABER, MICHAEL HACKMAN, JOSEPH HARRIS, NIKKI D. HARRIS, GINA HOWARD, BEN JOHNSON, PAUL JOHNSON, BONNIE J. KING, BRITTNEY LUTTERS, CHERYL MAJEL, JULIEANNE MENDOZA, LUANNE MORO, KALCIE ONTIVEROS, KIRSTEN ONTIVEROS, VIKKI L. OXLEY, JOEY PINK, MATTHEW PINK, JOHN RANDOLPH, LILLIAN VANCE, and MARIA J. VIVANCO<br><br>         Plaintiffs,<br><br>   vs.<br><br>ROBERT H. SMITH, LEROY H. MIRANDA JR., KILMA S. LATTIN, THERESA J. NIETO, and DION PEREZ<br><br>        Defendants. | Case No. 12CV1668 BEN BGS<br>_____<br><br>JURY TRIAL DEMANDED<br><br>COMPLAINT FOR CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, VIOLATIONS OF EQUAL PROTECTION, CONVERSION, TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, GROUP DEFAMATION, AND CIVIL CONSPIRACY |

## TABLE OF CONTENTS

INTRODUCTION AND OVERVIEW ............................................................... 1

JURISDICTION AND VENUE ..................................................................... 11

THE PARTIES ........................................................................................ 12

    A.    Plaintiffs .............................................................................. 12

    B.    Defendants .......................................................................... 14

BACKGROUND ..................................................................................... 17

SUBSTANTIVE ALLEGATIONS ............................................................... 21

    A.    Defendant Smith Secures his Power Over The Tribe And Its Members
            By Causing The Tribe To Adopt A New Constitution And Instituting New
            Enrollment Ordinances That Fail To Provide Due Process................... 22

            1.    Pala Purportedly Adopts A New Constitution .................. 22

            2.    Defendants Enact New Enrollment Ordinances
                    To Further Secure Their Power................................... 25

    B.    Defendants Disenroll The Britten Descendants Without Due Process............... 28

    C.    Defendants Lack Authority To Revisit The Issue Of Margarita
            Britten's Blood Degree................................................. 36

    D.    Defendants Exceed The Authority Granted Them Under Pala's Constitution
            And Enrollment Ordinance ................................................ 39

    E.    Plaintiffs Fail To Receive The Required Due Process Or Equal Protection .......... 44

    F.    The BIA Recommends That Disenrolled Britten Descendants Be
            Reinstated As Pala Members............................................. 46

DEFENDANTS' MOTIVE AND WRONGDOING ....................................... 48

SOVEREIGN IMMUNITY IS INAPPLICABLE............................................ 50

COUNT I ............................................................................................ 54

COUNT II............................................................................................ 56

COUNT III........................................................................................... 56

COUNT IV .......................................................................................... 57

COUNT V............................................................................................ 58

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1   COUNT VI ..............................................................................................59
2   PRAYER FOR RELIEF .........................................................................60
3   JURY TRIAL DEMANDED .....................................................................61
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## INTRODUCTION AND OVERVIEW

1.      This case involves a scheme and conspiracy by which Defendants – members of the Executive Committee of the Pala Mission Band of Indians ("Pala" or the "Tribe") – sought to enrich and entrench themselves in positions of power by stripping Plaintiffs of their Tribal citizenship.   In the course of "disenrolling" Plaintiffs, or removing them from the Tribal membership roll, Defendants deprived Plaintiffs of due process and actively took steps to ensure that Plaintiffs would be foreclosed from access to courts and appeals.   These egregious acts by Defendants were unauthorized and illegitimate.   Defendants' wrongful actions have caused extreme hardship on Plaintiffs and other disenrollees who have ceased receiving their per capita distributions of approximately $150,000 annually from the Tribe, have lost or are at risk of losing their homes, have lost their health insurance and medical care, and are no longer eligible for scholarships and tuition assistance programs.   Trust accounts for Plaintiffs' minor children, many of which contain over half a million dollars per account, are believed to be extinguished.   Plaintiffs will also suffer the intangible but significant loss of cultural identity, heritage, and Tribal citizenship.   The profound and devastating impact of the disenrollments on the disenrollees financially, psychologically, and socially cannot be underemphasized.   Indeed, one former Pala member's grief over her loss of tribal membership contributed to her death after she was disenrolled.

2.      In 1903, U.S. officials forcibly removed the Cupeño Indians from their ancestral homeland in Kupa onto the Pala Indian Reservation, and insisted that the Cupeño tribe and the Luiseño tribe combine into one.   They became the Pala Band of Mission Indians.   Margarita Britten ("Britten")[1], born in 1856, was one of the original members of the Cupeño tribe who moved to Pala.   Margarita Britten became a revered elder at Pala, had seven children, and participated in the Tribe until her death in 1925.

---

[1] Margarita's last name has also been spelled "Brittain".

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

3.     In 1960, Pala formally organized by adopting its Articles of Association. The Articles of Association provided that Pala would be governed by its General Council consisting of all adult members, who shall elect an Executive Committee consisting of a Chairman, a Vice-Chairman, a Secretary, and two adult members of the Band.  The Articles of Association also defined Pala's membership requirement.  Pala's membership requirement, like that of many American Indian tribes, is based on "blood quantum," or degree of Indian blood.  Pala's Articles of Association defined members as consisting of those persons whose names appear on the Pala Allotment Rolls on November 3, 1913, and all living descendants of those persons on the Allotment Rolls, provided that they have at least one-sixteenth (1/16) or more degree of Indian Blood of the Band.[2]  Margarita Britten's name appears on the Pala Allotment Rolls on November 3, 1913, as Allottee no. 25, and the Allotment Rolls identify her as having "4/4" degree Pala blood.

4.     Beginning in 2001, as Pala built a casino and became involved in other business ventures, the Tribe became very profitable.  However, the wealth of the Tribe began to breed greed and corruption, prompting Pala members – including the descendants of Margarita Britten ("Britten Descendants") who constituted a large voting block within the General Council – to begin questioning the conduct of members of the Executive Committee, headed by Chairman/Defendant Robert Smith ("Smith").  Among other things, questions were raised concerning the Executive Committee's entry into questionable transactions on behalf of the Tribe, the Executive Committee's use of Tribal assets for personal use, and the propriety of Tribal elections, including whether Smith had allowed non-members to vote in Tribal elections, paid for votes, and changed or destroyed absentee ballots.  In 2003, some of the Britten Descendants petitioned to request a Special Meeting to discuss inappropriate personal conduct of Chairman/Defendant Smith at the Pala Casino; however, Smith cancelled the meeting, declaring the petition signed by more than 90 Tribal members to be illegal.

---

[2] "Indian Blood of the Band" refers to the blood of the Cupeños, Luseños, and others who had formed the Tribe.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

5.      In early 2011, Reyes "King" Freeman ("Freeman") – a descendant of Margarita Britten who had formerly served as Chairman and Vice-Chairman of the Tribe – began an effort to recall Defendant Leroy Miranda ("Miranda") as Vice Chairman, after he learned that Miranda had been arrested for allegedly soliciting a male prostitute and did not complete his parole.  Although Freeman's petition garnered enough support to have a special meeting regarding the gross misconduct of Miranda, Pala's Executive Committee, made up of the Defendants, claimed that many of the Pala members who had initially signed the petition subsequently requested to have their names taken off the petition and that, therefore, the petition lacked sufficient votes and was denied.  Freeman's attempt to remove Miranda from office, however, infuriated the Defendants, particularly Chairman/Defendant Smith, who had already had a personal grudge against Freeman. During a heated General Council meeting, Smith said to Freeman, "your kids are off the rolls."  On June 1, 2011, Defendants disenrolled eight Britten Descendants from the Tribe – including three of King Freeman's children and other relatives – purportedly on the grounds that they did not have the 1/16 blood quantum necessary to be Pala members because their ancestor, Margarita Britten, was not a 4/4 degree Pala Indian.

6.      After these eight Britten Descendants were disenrolled, a flyer condemning Defendants' wrongful disenrollments was distributed.   Among other things, the flyer stated: "People want to know how can the Executive/Enrollment Committee disenroll only eight family members and not the rest of family who are 1/16th descendants? This is how:  Robert Smith has turned this 'General Council' tribe into a dictatorship."   In response to the flyer, which Chairman/Defendant Smith believed was written by King Freeman, Smith issued a letter to Tribal members attacking Freeman and threatening, among other things, that:  "King Freeman has lived on his own lies for over 20 years as a member in our Band and in our community. The Pala Band of Mission Indians voting membership needs to take a firm stand and stay strong as an entity and

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

not allow this to continue. *He wants the rest of his family who are 1/16 descendants, disenrolled!!! Don't take my word for it, see his flyer!!!*[3]

7.  Soon after issuing this letter, on February 1, 2012, Chairman/Defendant Smith carried out his threat of disenrolling other relatives of King Freeman by expelling from the Tribe 154 other Britten Descendants. In doing so, Defendants eliminated approximately 15 percent of the Tribe's members. By disenrolling Freeman's relatives, who not only lost money and benefits but also their rights to vote and to petition, Defendants secured their power and control over the Tribe and stood to benefit financially, as the per capita payments that would have otherwise gone to the disenrolled Britten Descendants would now be distributed to Defendants and other members of the Tribe. Plaintiffs are some of the Britten Descendants who were disenrolled from the Tribe by Defendants on June 1, 2011, and February 1, 2012.

8.  In disenrolling Plaintiffs and other Britten Descendants, Defendants acted palpably and manifestly beyond their authority. As the events leading up to the disenrollments demonstrate, these disenrollments were not about Defendants' acting within their official capacity to ensure that rightful members belong in the Tribe, but were instead about Defendants' abuse of power by using the disenrollments to retaliate against political enemies, keep themselves in their positions of power, and eliminate and punish members of a particular familial and racial lineage who had dared to challenge their authority.

9.  Although Defendants purported to derive their power to disenroll the Britten Descendants from Pala's Constitution and the Revised Enrollment Ordinances that they had enacted, Defendants in fact lacked such power. Among other things, Pala's Constitution was not validly adopted because it was not approved by a majority of the voters in a duly called election, as required pursuant to Section 476(a) of the Indian Reorganization Act (25 U.S.C. § 476(a)) and Pala's Articles of Associations, which had preceded the Constitution. Instead, the Constitution was adopted through a Resolution that was passed by only 27 votes. As Pala had approximately

---

[3] Unless otherwise indicated, bold and italicized text indicates that emphasis has been added.

900 members, over 300 votes would have been required to approve the Constitution in order for this important governing document to be validly adopted. Because the required election to ratify the Constitution did not occur, Pala continues to be governed by its original Articles of Association and the Original Enrollment Ordinance enacted thereunder, which provide that membership decisions could not be made unilaterally by the Executive Committee. Notably, as recently as February 2012, Pala's website stated that the Tribe was governed by its Articles of Association, rather than its Constitution.

10. Even assuming the validity of Pala's Constitution and the Revised Enrollment Ordinances enacted thereunder by Defendants, Defendants exceeded their authority in disenrolling the Britten Descendants. Among other things, Pala's Constitution empowered members of the Executive Committee to add or delete names from the Tribal rolls only for reasons of death, birth, or voluntary relinquishment of membership by a Pala member. The disenrollments of the Britten Descendants did not fall under any of these criteria. Moreover, Pala's Revised Enrollment Ordinances specifically state that "the Executive Committee of the Pala Band, by adoption of this revised ordinance, does not intend to alter or change the membership status of individuals whose membership has already been approved and who are currently listed on the membership roll of the Pala Band of Mission Indians ...." Because the membership of Plaintiffs and other Britten Descendants had already been approved, and they were listed on Pala's membership roll, Defendants had no power to remove Plaintiffs and other Britten Descendants from Pala's Tribal rolls.

11. Additionally, Defendants had no power to disenroll Plaintiffs and the other Britten Descendants on the basis of Margarita Britten's blood degree. The 1913 Pala Allotment Rolls, which serve as the original "base roll" for the Tribe, list Margarita Britten as having "4/4" degree Pala Indian blood. Although unauthorized alterations were later made to Margarita Britten's blood degree, in the 1980s, after a thorough and extensive investigation – including a review of sworn statements, government records, family history cards, and other evidence – the Bureau of Indian Affairs ("BIA"), the division of the Department of Interior in charge of overseeing American

- 7 -

1  Indian issues, ruled that Margarita Britten was a full-blooded Pala Indian. The BIA has repeatedly

2  reiterated its conclusion that this ruling *was final*. In addition, in 1984, Pala's General Council –

3  comprised of all Pala members 18 years and older – voted on and approved a resolution to correct

4  Margarita Britten's blood degree to reflect that she was a full-blooded Pala Indian.  Because

5  Defendants, as members of Pala's Executive Committee, were required to carry out the resolutions

6  of the General Council, they *had to* accept that Margarita Britten was a full-blooded Pala Indian,

7  and could not arbitrarily reach a different conclusion on their own to suit their personal agenda.

8      12.    Further, Defendants lacked power to decide on the disenrollment of the Britten

9  Descendants because at least two of the Defendants were charged and pled guilty to crimes while

10  in office.   Under Pala's Constitution, their positions should have been automatically vacated and

11  they should not have been serving on Pala's Executive Committee.  As such, Defendants' decision

12  to disenroll the Britten Descendants was invalid.

13      13.    In addition, Defendants did not have authority to disenroll Plaintiffs because at a

14  General Council meeting on January 9, 2002, the Tribe approved a moratorium on membership

15  requirements for ten (10) years.  As such, Defendants were restricted from taking any action with

16  respect to any tribal member's status or implementing enrollment ordinances that gave themselves

17  power over the Tribal membership.  Further, since the BIA had final approval over membership

18  applications as of 2002, the BIA had the final say on enrollments, not Defendants.

19      14.    Moreover, Defendants exceeded the power granted them by the Tribe because, in

20  extinguishing Plaintiffs' citizenship from the Tribe, Defendants violated the rights afforded to

21  Plaintiffs under Pala's governing laws.  Even assuming the validity of Pala's Constitution, the

22  Constitution mandates that "[t]he Pala Band shall provide all persons with due process and equal

23  protection of the law required by the Indian Civil Rights Act."  Although the Constitution provides

24  that "[t]he Executive Committee may from time to time amend and/or replace its existing

25  Enrollment Ordinance with an Ordinance governing adoption, loss of membership, disenrollment

26  and future membership," it requires that the Executive Committee can only do so "provided that

27  such ordinance are in compliance with this Constitution."  Indeed, the Constitution specifically

28

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

provides that "[p]rocedures for disenrollment ... shall provide that the member receives due process and equal protection as required by the Indian Civil Rights Act." The Indian Civil Rights Act, enacted by Congress in 1968, made many of the guarantees of the Bill of Rights applicable to Indian tribes in order to prevent abuses that many tribal members had endured from the "sometimes corrupt, incompetent, or tyrannical tribal officials." However, in violation of Pala's Constitution and the Indian Civil Rights Act, Plaintiffs were not provided with any due process or equal protection when they were disenrolled from the Tribe. Plaintiffs were not given notice that they were being considered for disenrollment, did not have an opportunity to present evidence, and did not have a hearing. Instead, they were simply notified that they had been disenrolled from the Tribe.

15.    In fact, Defendants conspired to ensure that Plaintiffs and other disenrolled Britten Descendants would have no recourse in any court or on appeal in connection with the wrongful and illegitimate disenrollments that violated due process and civil rights. Just months before beginning their wave of disenrollments – and concurrent with King Freeman's attempt to remove Vice Chairman/Defendant Miranda – Defendants caused Pala to withdraw its membership from the Intertribal Court of Southern California ("Intertribal Court"). The Intertribal Court provides hearings to member tribes to resolve tribal disputes, and it operates under a transparent process including access to court records, information about cases, and appeals. By withdrawing from the Intertribal Court, Defendants, who controlled and dominated Pala, could then deprive Plaintiffs of their rights without any interference or scrutiny. This is particularly so because Defendants had already taken away any meaningful appellate review of their enrollment decisions when they enacted Pala's Revised Enrollment Ordinances to provide that while individuals challenging enrollment decisions by the Executive Committee could technically appeal their decision to the BIA, the BIA *could not compel* the Executive Committee to change or reverse its decision but *could only make a recommendation* to the Executive Committee as to whether it should uphold or change its decision. In contrast, prior to Defendants' adoption of the Revised Enrollment

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Ordinances, Pala's Original Enrollment Ordinance provided that the U.S. Secretary of the Interior was the final arbiter on Pala membership issues.

16.     Defendants' scheme and conspiracy to disenroll Plaintiffs and other Britten Descendants from the Tribe was willful and malicious.  Defendants' disenrollment of Plaintiffs was not about defining Pala's membership, as Pala's membership requirements had not changed since the Tribe formally organized.  Instead, Defendants' actions arose from their desire to eliminate political and personal enemies and for personal gain.  By purging Plaintiffs and other Britten Descendants from the Tribe under the guise of conducting their official duty, Defendants effectively took away these individuals' rights to petition, to vote, and to otherwise challenge Defendants' conduct so that Defendants could continue their reign of control and dominance over the Tribe.  In addition, by eliminating these members from Tribe, Defendants stood to receive additional monetary distributions from the Tribe and would continue to stay in power to engage in questionable financial transactions without scrutiny.  Plaintiffs were deprived of due process and equal protection in connection with their disenrollments, and Defendants additionally took steps to ensure that they would have no recourse in the Intertribal Courts.  There are no tribal remedies to exhaust, and there is no process for review of Defendants' conduct.  Plaintiffs, therefore, seek remedy from this Court.[4]

17.     As noted by Professor Wilkins, a Lumbee Indian and professor of American Indian studies at the University of Minnesota, "some tribal officials are, without any concern for human rights, tribal traditions or due process, arbitrarily and capriciously disenrolling tribal members as a means to solidify their own economic and political bases and to winnow out opposition families who disapprove of the direction the tribal leadership is headed.  What was historically a rare event . . . has tragically become almost commonplace in Indian country, leaving thousands of bona fide Native individuals without the benefits and protections of the nations they are biologically, culturally, and spiritually related to."

---

[4] Pala's tribal court only hears vehicle citation cases.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

18.    Plaintiffs' monetary distributions and other benefits were cut off effective the date of their disenrollments.  Although the BIA, upon the appeals of certain of the Plaintiffs and other Britten Descendants, has recommended that the Executive Committee re-enroll them, Pala's Executive Committee – which is still currently controlled by Chairman Smith and Vice Chairman Miranda – has yet to act on the BIA's recommendation regarding the first eight disenrollees, despite the requirement in Pala's Revised Enrollment Ordinances requiring that they act within 30 days.  Moreover, the Executive Committee declared its decision to disenroll the other 154 Britten Descendants "final," even before it received the BIA's recommendation to re-enroll them.  This further demonstrates Defendants' flagrant disregard of the law and any due process.

19.    In addition to the money and other property that have been wrongfully taken from them by Defendants, Plaintiffs have suffered, and continue to suffer, the loss of their Pala citizenship, culture, heritage and ancestry.  The U.S. Supreme Court has previously noted that deprivation of citizenship is "an extraordinarily severe penalty" with consequences that "may be more grave than consequences that flow from conviction for crimes."  Indeed, Native American Indians are referring to disenrollments as "genocide" on the Internet, as entire families are effectively being killed off from their tribes.  As a recent March 2012 article in the Los Angeles Times aptly summed up in its heading regarding the disenrollment of Plaintiffs and other Britten Descendants, these disenrollments are a continuation of "The Cupeños' own Trail of Tears - Today's Pala Band of Mission Indians was born of a traumatic event in 1903. *For some Cupeño descendants, the pain continues.*"

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the civil rights claims pursuant to 42 U.S.C. §1985(3) and 42 U.S.C. §1981.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (Federal Question) and 28 U.S.C. §1343(a)(1)-(a)(2) (Civil Rights).

21.    This Court has supplemental jurisdiction over the claims arising under common law, pursuant to 28 U.S.C. §1367, because these claims arise from the same nucleus of operative

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1    facts alleged in this Complaint and are so related to the federal claims over which this Court has

2    original jurisdiction that they form part of the same case or controversy.

3         22.      Venue is proper in this Court because the Defendants reside in this County and

4    engaged in acts of wrongdoing therein.

**THE PARTIES**

5    **A.      Plaintiffs**

6

7         23.      Plaintiff Ronald D. Allen, Jr. was, at all relevant times hereto, a Pala member until

8    he was disenrolled and disenfranchise from the Tribe on February 1, 2012.

9         24.      Plaintiff Raymond Bozigian was, at all relevant times hereto, a Pala member until

10   he was disenrolled and disenfranchise from the Tribe on February 1, 2012.

11        25.      Plaintiff Alexandra M. Castor was, at all relevant times hereto, a Pala member until

12   she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

13        26.      Plaintiff Keith Denver was, at all relevant times hereto, a Pala member until he was

14   disenrolled and disenfranchised from the Tribe on June 1, 2011.

15        27.      Plaintiff Milton Denver was, at all relevant times hereto, a Pala member until he

16   was disenrolled and disenfranchised from the Tribe on June 1, 2011.

17        28.      Plaintiffs Jessica Florez was, at all relevant times hereto, a Pala member until she

18   was disenrolled and disenfranchised from the Tribe on February 1, 2012.

19        29.      Plaintiff Anthony Freeman was, at all relevant times hereto, a Pala member until he

20   was disenrolled and disenfranchised from the Tribe on June 1, 2011.

21        30.      Plaintiff Mikki A. Graber was, at all relevant times hereto, a Pala member until she

22   was disenrolled and disenfranchised from the Tribe on February 1, 2012.

23        31.      Plaintiff Joseph Harris was, at all relevant times hereto, a Pala member until he was

24   disenrolled and disenfranchised from the Tribe on February 1, 2012.

25        32.      Plaintiff Nikki D. Harris was, at all relevant times hereto, a Pala member until she

26   was disenrolled and disenfranchised from the Tribe on February 1, 2012.

27

28

- 12 -

33.     Plaintiff Michael Hackman was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

34.     Plaintiff Gina Howard was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised on June 1, 2011.

35.     Plaintiff Ben Johnson was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

36.     Plaintiff Paul Johnson was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

37.     Plaintiff Bonnie L. King was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

38.     Plaintiff Brittney Lutters was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

39.     Plaintiff Cheryl Majel was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on June 1, 2012.

40.     Plaintiff Julieanne Mendoza (a/k/a Julieanne Pink) was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

41.     Plaintiff Luanne Moro was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on June 1, 2011.

42.     Plaintiff Kalcie Ontiveros was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

43.     Plaintiff Kirsten Ontiveros was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

44.     Plaintiff Vikki L. Oxley was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

45.     Plaintiff Joey Pink was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

46.     Plaintiff Matthew Pink was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

47.     Plaintiff John Randolph was, at all relevant times hereto, a Pala member until he was disenrolled and disenfranchised from the Tribe on February 1, 2012.

48.     Plaintiff Lillian Vance was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

49.     Plaintiff Maria J. Vivanco was, at all relevant times hereto, a Pala member until she was disenrolled and disenfranchised from the Tribe on February 1, 2012.

**B.     Defendants**

50.     Defendant Robert H. Smith ("Smith") has been Chairman and a member of Pala's Executive Committee since 1987.  As Pala's Chairman, Smith was also the head of Pala's casino operations and the Tribe's other business activities.   Smith participated in the scheme and conspiracy to disenfranchise and disenroll Plaintiffs from the Pala tribe.  Smith resides within this District.

51.     Defendant Leroy H. Miranda Jr. ("Miranda") has been Vice-Chairman and a member of Pala's Executive Committee since 2001.  Miranda participated in the scheme and conspiracy to disenfranchise and disenroll Plaintiffs from the Pala tribe.  Miranda resides within this District.

52.     Defendant Kilma S. Lattin ("Lattin") was Secretary and a member of Pala's Executive Committee from 2005 to 2011.  He assisted in drafting and ratifying tribal ordinances, policies and resolutions, as well as Constitutional amendments.  Lattin participated in the scheme and conspiracy to disenfranchise and disenroll Plaintiffs from the Pala tribe.  Lattin resides within this District.

53.     Defendant Theresa J. Nieto ("Nieto") has been Treasurer and a member of Pala's Executive Committee since 2001.   Nieto participated in the scheme and conspiracy to disenfranchise and disenroll Plaintiffs from the Tribe.  Nieto resides within this District.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

54. Dion Perez ("Perez") has been a Council Member on Pala's Executive Committee since 2001. Perez participated in the scheme and conspiracy to disenfranchise and disenroll Plaintiffs from the Pala tribe. Perez resides within this District.

55. Smith, Miranda, Lattin, Nieto and Perez ("Defendants"), as members of Pala's Executive Committee, participated in the scheme and conspiracy to disenroll Plaintiffs and other Britten Descendants. One of the members of the Executive Committee, Annalee Trujillo ("Trujillo"), is not a named defendant herein because, as a Britten Descendant, she did not participate in the Executive Committee meetings regarding the disenrollments of Plaintiffs and the other Britten Descendants. Trujillo was also disenrolled by Defendants from the Tribe on February 1, 2012, and she lost her Executive Committee position thereby.

56. Defendants, as members of Pala's Executive Committee, were in positions of power and control over members of the Tribe. Because Pala did not have a separate Enrollment Committee, Defendants were also the members of Pala's Enrollment Committee. Defendants exceeded their authority by disenfranchising and disenrolling the descendants of Margarita Britten arbitrarily, capriciously, and unlawfully. Moreover, they took steps to ensure that Plaintiffs would have no recourse to challenge their gross misconduct by stripping the BIA of its authority over membership issues and by withdrawing Pala from the Intertribal Courts. Defendants' disenrollment of the Britten Descendants arose from greed, discrimination against a particular family and race, personal animus, and their desire to punish those who had asserted their rights and dared to challenge them. Plaintiffs and other Britten Descendants who were disenrolled immediately lost their right to vote in Tribal elections and to petition for the removal of officers from the Executive Committee, thus ensuring that the Defendants, as members of the Executive Committee, would remain in positions of power and control over the Tribe. The disenrollment also served to silence any other Pala members who might speak up against Defendants. By disenfranchising and disenrolling the Britten Descendants, Defendants removed political enemies and got rid of individuals with whom they had personal animus and vendettas. By purging the

Tribe of the Britten Descendants, Defendants would be free to continue their reign of domination under the cloak of secrecy with no dissension.

57.     In eliminating the Britten Descendants from the Tribe, Defendants stood to gain financially since a reduction in Pala's membership meant that the per capita payments and other money that would have gone to those Britten Descendants would instead be distributed to themselves and the remaining Pala members.  Moreover, Defendants could continue to operate the Tribe and continue to enter into questionable transactions on behalf of the Tribe without challenge to their authority or scrutiny.  Upon information and belief, in or around 1995, the accounting firm of Hosaka & Nagel, which had been hired by the Tribe to conduct an annual audit, was terminated after they reported discrepancies to Chairman/Defendant Smith.

58.     Additionally, by ridding the Tribe of the Britten Descendants – who constitute the majority of the Cupeños in the Tribe – Defendants would eliminate most of the Cupeños from Pala, thus settling century old scores between the Cupeños and the Luseños.  Chairman/Defendant Smith and some elder Luseños believe that the Luseños should have complete control over the tribal lands because they were there first.  As such, the disenrollment of the Britten Descendants was also racially motivated.

59.     Defendants Smith, as Chairman of Pala, dominated the Tribe's Executive Committee.  The other Executive Committee members are beholden to and are controlled by Smith.  For example, in the Tribal election in 2001, even though King Freeman was elected Vice Chairman, Chairman/Defendant Smith, who had a long standing personal grudge against Freeman, disallowed a handful of votes and announced Miranda the Vice Chairman.  In addition, in June 2010, several Tribal members had raised the fact that Lattin should not have been allowed to run for Secretary because of his criminal record; however, Smith ignored these arguments and, instead, banished the Tribal members from meetings and withheld their per capita distributions for a year.  Further, public records indicate that Pala Chairman/Defendant Smith is either related to Pala Treasurer/Defendant Nieto or is using her last name for other purposes, as the records indicate that Defendant Smith might have used the aliases "Robert Nieto, Bob Nieto, and Rob Nieto."  Smith

1  used his influence to encourage and cause the other Defendants to agree to participate in a

2  conspiracy to deprive Plaintiffs and other Britten Descendants of their civil rights and property.

3       60.    Each of the Defendants had knowledge of and actively participated in, agreed,

4  acquiesced in and/or approved of the wrongdoings alleged herein.  Each Defendant in this action,

5  individually or jointly, as alleged herein, participated in a scheme and conspiracy to deprive

6  Plaintiffs of their property and rights without due process or equal protection.

7  <center>**BACKGROUND**</center>

8       61.    In 1880, former California Governor John Downey purchased the ancestral land of

9  the Cupeño Indian tribe, called Kupa, now Warner's Springs, in order to develop the land as a

10  resort.  Following legal challenges, the U.S. government ordered the Cupeños removed from Kupa.

11  On May 12, 1903, armed federal agents forcibly evicted hundreds of Cupeños from Kupa.  Each

12  family was allowed one wagon to carry all of their possessions.  After a 40-mile forced march that

13  took three days, the Cupeños were herded around Mt. Palomar to a spot beside a Catholic mission

14  in the San Luis Rey River Valley.  There, they found a wasteland.  This event is known as the

15  "Cupeño Trail of Tears."  At the insistence of U.S. officials, the Cupeño Indians moved onto the

16  Pala Indian reservation and melded with the Luseño tribe that lived nearby.  The modern day Pala

17  Band of Mission Indians are descendants of the original Luseños and Cupeños who constitute the

18  Tribe.  However, to this day, tensions exist between descendants of the two tribes.  Descendants of

19  the Luseños prefer one cemetery, while the descendants of the Cupeños largely prefer another.

20       62.    One of the survivors of the 1903 forced march was Margarita Britten, Pala Allottee

21  no. 25.  Britten became a revered tribal elder at Pala and had seven children.  Margarita Britten

22  died in 1925.

23       63.    Many American Indian tribes have blood quantum laws to determine their

24  membership.  Tribes often use U.S. census and other documents from the late 1800 and 1900s to

25  establish membership rolls. Only direct descendants of those original members are eligible to be

26  enrolled as members of Indian tribes. Disenrollment is when someone is stripped of citizenship in

27  his or her tribe.  When members are disenrolled, they are no longer able to participate in tribal

28

<center>- 17 -</center>

elections or other political affairs. They are denied the rights and services afforded members of the federally recognized tribe from which they have been removed.  They are no longer eligible for services and programs offered by the State to members of federally recognized tribes.  And disenrolled members may be forced off Indian land.  They, in essence, will have lost all of the benefits and identity derived from being a member of their tribe.

64.    In 2001, Pala opened a casino on its reservation.  The casino has over 2,000 slot machines, 15 poker tables, and 87 table games.  The casino also has a 508-room, 10-story hotel, a 10,000-square foot spa and salon with 14 treatment rooms, a fitness center, a swimming pool with poolside cabanas, and 10 restaurants.  In addition to the casino and hotel, Pala is involved in other business, such as a motocross raceway.

65.    Pala prospered from the casino and its other business investments.  According to a report, the Tribe had an income surplus of over $140 million in 2008.  A July 1, 2011 article entitled "Top of Their Game," published in the American Executive, also reported that defendant Smith, Chairman of the Pala tribe, had stated that business was strong and that the hotel was sold out every weekend.

66.    In allowing American Indians to have gaming operations on their reservation, and in enacting the Indian Gaming Regulatory Act to govern Indian gaming in the United States, Congress expressly wanted "to ensure that the Indian tribe is the primary beneficiary of the gaming operation."  To that end, Pala had to meet certain requirements, including submitting a plan for allocating its gaming revenue to the BIA.  Pursuant to Pala's Amended Plan for the Allocation of Gaming Revenues (PAGR), 60% of the Tribe's gaming revenue is supposed to go to per capita payments made to individual members of the Tribe, and 15% of the gaming revenue is supposed to provide for the general welfare of Tribal members, including medical, dental, unemployment, welfare and retirement benefits, scholarships, tuition and tutoring, annuities and the establishment of trust funds for minor members.

67.    Because Pala, like many other American Indian tribes, requires that casino money be distributed to members of the Tribe, the fewer the Tribal members the more money the

- 18 -
COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1    remaining members will receive.  As such, there is a strong incentive for those in power and

2    control to disenroll tribal members.  The American Indian Movement estimates that upward of

3    3,000 tribal members from two dozen tribes in California and other states have been "disenrolled"

4    in the last 15 years.

5        68.      According to a November 29, 2006 USA Today article, as Native American tribes

6    purge members from their rolls and deny applications, thousands of Indians have lost their cultural

7    identities, share of casino profits, and access to tribal benefits, such as medical care, housing, and

8    education.  The article quoted Kevin Gover, law professor at Arizona State University and former

9    Assistant Secretary of the Interior for Indian Affairs, as stating that he believes "expulsions are

10   related to feuding families that form political factions who wish to rid their enemies."  The article

11   also reported that disenrollments are many times caused by tribal members questioning potentially

12   fraudulent transactions, quoting a disenrolled member from the Narragansett Indian tribe in Rhode

13   Island who said that she and dozens of relatives were kicked out because she questioned how the

14   tribe spent $1 million it received from Harrah's Entertainment, which had been planning a casino

15   with the tribe.  The article further reported that disenrollments are often without basis; for example,

16   the Pechanga tribe has disenrolled hundreds of members, despite findings by the ***Tribe's own***

17   ***expert***, John Johnson, a curator of anthropology at the Santa Barbara Museum of Natural History,

18   that disenrolled members in fact belong in the Tribe.  The article described the effects of

19   disenrollments, including as follows:

20              Madariaga, 43, and his family lost access to tribal benefits, including the
21              monthly casino payout and meals for the elderly, he says. He lost his job at
             the casino. The children had to leave the reservation school.
22
             Madariaga's 89-year-old grandfather, Lawrence, has prostate cancer. After
23           his health insurance was cut off, he didn't take his medications for a few
             months, Madariaga says. Now, he's dipping into his retirement to pay for
24           them.
25
             Madariaga describes his grandfather as an integral member of the tribe
26           who helped upgrade the water system and bring electricity and phones to
             tribe members. "He designed and helped build the health clinic," he says
27           of his grandfather.
28

- 19 -
COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Madariaga says disenrollment "took a lot out of" his grandfather and grandmother, Sophia, 86.

"The anger, the stress, that's not good at their age and for their health," he says. "When they were cut off from the health benefits, they were very stressed."

*But the hardest part hasn't been losing benefits and casino payouts, Madariaga says.*

*"What matters is taking away our heritage," he says.*

*"It's like taking your family and wiping them out of history."*

69.   Similarly, an April 22, 2012 Las Vegas Review Journal article entitled "It Was Identity Theft," reported the effects that disenrollments have had on tribal members, including financial ruin, bankruptcy, and loss of their homes, not to mention their sense of identity.  Often there is no recourse for disenrollees; even when disenrolled members win a reversal of the disenrollment decision in tribal courts, leaders of the tribe may ignore the tribal court decisions. The article quoted David Wilkins, a professor of American Indian studies at the University of Minnesota, as follows:

*Native American tribes have increasingly used the "mask" of blood quantums to oust members but there is "obviously something else at work,"* says David Wilkins, a Lumbee Indian and professor of American Indian studies at the University of Minnesota.

\*        \*        \*

The practice is especially prevalent in California, where gambling at dozens of casinos owned by tribes takes in billions of dollars a year. Thousands of Native Americans there have been kicked out of their tribes in recent years.

*The outings can be spurred by family feuds or "alleged" racial criteria, which Wilkins says are questionable.*

"How does one accurately gauge blood quantum?  Frequently the (membership) rolls were corrupt or flawed. *It's a ruse used by tribes to justify their actions.*"

*The main reason is financial, he says, and involves "problems related to the distribution of assets."*

- 20 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

*Some of the disenrolled in California say they were targeted after "raising questions about the tribal government's political or economic activities," Wilkins says. The tribes "are feeling emboldened, doing whatever they want to winnow out those who don't toe the tribal line."*

Wilkins is especially troubled by the practice as a Native American. It goes against the whole notion of the tribe as an extended family, he says.

*"It's really a dirty scene. You have tribes violating their own historical traditions and values. Historically, you found a way to restore harmony and balance. Historically, we don't do this to ourselves."*

## SUBSTANTIVE ALLEGATIONS

70.     Pala is located on a 12,000-acre reservation east of Interstate 15 and south of Temecula. Many of the Tribe's members live on the reservation. Prior to the disenrollment of the Britten Descendants, the Tribe had approximately 900 enrolled members.

71.     Pala is supposed to be governed by its General Council, consisting of all adult members eighteen years and older. The General Council elects an Executive Committee comprised of six elected officials with two-year terms that includes the chairman, vice chairman, treasurer, secretary, and two council persons.

72.     On November 6, 1960, the Tribe formally organized by adopting the Pala Articles of Association, which were approved by the Commission of Indian Affairs on March 7, 1960. Section 2(A) of the Articles of Association defined membership in the Tribe, stating that it shall consist of:

> (1) Those persons whose names appear on the Pala Allotment Rolls as approved by the Secretary of the Interior on April 12, 1895, and November 3, 1913, who are living on the date of approval by the Commissioner of Indian Affairs;

> (2) All living descendants of persons on the Allotment Rolls covered in Section 2.A(1) regardless of whether the original allottees are living or deceased, provided that such descendants have one-sixteenth (1/16) or more degree of Indian blood of the Band;

- 21 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(3) Those persons who have been adopted by the Band and such adoption has been approved by the Bureau of Indian Affairs.

73.    Pursuant to Pala's Articles of Association, Margarita Britten was a Pala member because her name appears on the original 1913 Pala Allotment Rolls as Allottee no. 25.  The 1913 Pala Allotment Rolls also identifies Margarita Britten as having "4/4" degree Pala Indian blood.

74.    On November 26, 1961, Pala adopted an ordinance to establish regulations and procedures governing the enrollment of members into the Tribe and to maintain the roll on a current basis (the "Original Enrollment Ordinance").  The Original Enrollment Ordinance provided that any person whose application for Pala membership had been rejected by the Executive Committee could appeal to the Area Director of the BIA.  The Area Director shall forward to the Commissioner of Indian Affairs the appeal, supporting data, his recommendation, and the report and recommendation of the Executive Committee.  If the Commissioner determines that the appellant is not eligible for enrollment, he shall notify the appellant in writing of his decision and the reasons therefor.  If the application is rejected by the Commissioner, the appellant has 30 days from the mailing of the notice to file an appeal with the Secretary of the Interior, whose decision on appeal shall be final and conclusive.  Accordingly, Pala's Original Ordinance provided numerous safeguards regarding enrollment and membership in Pala.

**A.    Defendant Smith Secures His Power Over The Tribe And Its Members By Causing The Tribe To Adopt A New Constitution and Instituting New Enrollment Ordinances That Fail To Provide Due Process**

**1.    Pala Purportedly Adopts A New Constitution**

75.    In 1987, defendant Robert Smith became Chairman of the Pala tribe.  As Chairman, he began to take actions to secure his power over the Tribe and its members, particularly as the Tribe became involved in Indian gaming and became wealthy from casino money.

76.    On November 22, 1994, Pala revised its Articles of Association into a constitution, as Smith convinced the Tribe that it was necessary to do so in order for Pala to participate in Indian gaming.  In June 1995, the proposed constitution was reviewed by the BIA and returned with

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

recommendations for consideration.  On or about November 1997, a final draft of the revised constitution was completed.  A Resolution was passed on November 19, 1997 to "adopt the Pala Tribal Constitution to supersede the Articles of Association."[5]

77.  Pala's new Constitution purported to give Pala's Executive Committee the power to "amend and/or replace its existing Enrollment Ordinance with an Ordinance governing adoption, loss of membership, disenrollment, and future membership."  However, because the Constitution was not properly adopted, the Executive Committee in fact lacked such power.

78.  Among other things, the Indian Reorganization Act of 1934 ("IRA"), which sets forth the procedures for adoption of a constitution by an Indian tribe, provides that:

> Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when -
>
> (1) *ratified by a majority vote of the adult members of the tribe or tribes at a special election* authorized and called by the Secretary under such rules and regulations as the Secretary may prescribe; and
>
> (2)  approved by the Secretary pursuant to subsection (d) of this section.

25 U.S.C. §476(a).

79.  Similarly, Pala's Constitution provides that:

ARTICLE IX – AMENDMENTS AND EFFECTIVE DATE

Section 1      EFFECTIVE DATE

> This Constitution shall become effective immediately after its approval by *a majority vote of the voters voting in a duly called election* at which this Constitution is approved by the Bureau of Indian Affairs.

80.  Thus, pursuant to the Indian Reorganization Act and Pala's Constitution itself, approval by a majority of the voters in a duly called election was required for Pala's Constitution

---

[5] The November 19, 1997 Constitution is referred herein as the "Constitution."

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

to become effective.  However, this did not occur.  Instead, Resolution 97-36, the resolution that approved the adoption of the Pala Constitution, was only approved by a vote of 27 "For" and 0 "Against" in a Special Meeting – barely satisfying the quorum of at least 25 voters necessary to validate actions by the General Council.  As Pala had approximately 900 members, approval by at least 300 or so adult voters would have been necessary to ratify the Constitution.  Since Pala's Constitution was not ratified by a majority vote of the adult members of Pala, it is invalid.  Indeed, in response to a Freedom of Information Act ("FOIA") request to the BIA for any documents "proving compliance with Section 476(a) described above, including the date a special election was authorized, called and conducted by the Secretary that resulted in the ratification of the Tribe's Constitution," the BIA responded that it could not locate any such documents after having conducted a thorough search of its files – thus confirming that no such election to ratify the Pala Constitution had occurred.  Because a majority vote ratifying Pala's Constitution did not occur, the Constitution was not properly adopted by the Tribe and therefore is not the governing document of the Tribe.  Instead, Pala is still governed by its original Articles of Association.

81.    The fact that Pala's Constitution is invalid is substantiated by other evidence.  For example, Pala's Tribal Gaming Ordinance enacted on February 14, 2000, states that the Tribe is governed by its Articles of Association, not by its Constitution, as follows:

> WHEREAS, *the Tribe is governed by Articles of Association* approved by the Commissioner of Indian Affairs which establish a General Council and an Executive Committee; and
>
> WHEREAS, pursuant to Article 3 of the Tribe's Articles of Association, the General Council is the governing body of the Tribe; and
>
> \*       \*       \*
>
> This is to certify the above Pala Gaming Authority Ordinance, Resolution 99-39 was adopted by the General Council at a duly called meeting of that Body held on October 20, 1999, at which a quorum was present by a vote of 19 in favor, 0 opposed.

82.     Further, as recently as February 2012, Pala's website stated that "The tribe is organized under Articles of Association approved in July 1961 and later amended in 1973 and 1980," instead of stating that it was governed by its Constitution.

### 2.     Defendants Enact New Enrollment Ordinances To Further Secure Their Power

83.     As Pala constructed a casino and reaped profits therefrom, Chairman/Defendant Smith sought to further secure his position in the Tribe, to control the Tribe and its members, and to limit government and court oversight to ensure that he would have complete control over the Tribe and its wealth.

84.     In 2001, during the Tribal elections, King Freeman – a descendant of Margarita Britten and a personal enemy of Defendant Smith – was elected Vice Chairman of the Tribe. However, Smith disallowed a handful of votes and declared Leroy Miranda the winner. That year, Defendant Miranda became Vice-Chairman of the Executive Committee, Defendant Theresa Nieto became Treasurer, and defendant Perez became an Executive Council member. In 2005, Defendant Lattin became Secretary of the Executive Committee. Once these individuals came to power as members of Pala's Executive Committee, they enacted ordinances that gave the Executive Committee even more power.

85.     On December 12, 2005, Defendants, as members of Pala's Executive Committee, revised Pala's Original Enrollment Ordinance (the "12/12/05 Revised Enrollment Ordinance"). In Section 6 of the 12/12/05 Revised Enrollment Ordinance, Defendants gave themselves the exclusive power to reevaluate approved membership applications, as follows:

> A.     Reevaluation of Approved Applications
>
> Should the Executive Committee subsequently find that an applicant or the person filing the application on his/her behalf misrepresented or omitted facts that might have made him/her ineligible for enrollment, his/her application shall be reevaluated in accordance with the procedure for processing an original application. Any decision of the Executive Committee that the member's name should be

removed from the roll shall be subject to the affected member appealing that decision as specified herein.

86.     Although Defendants purported to provide for appeals of their enrollment decisions in Section 6 of the Revised Enrollment Ordinance, any such appeal was only illusory.  In Section 7 of the Revised Enrollment Ordinance regarding appeals, Defendants attempted to ensure that there would be no true oversight of their enrollment decisions by limiting any appeals of their enrollment decisions to only a *recommendation* by the BIA and specifically precluding review of their decisions by state and federal courts, as follows:

Section 7.     Appeals of Eligibility Decisions

A.     A person whose application has been rejected shall have 30 days from the date of the mailing of the notice to him to file with the Pacific Regional Director [of the BIA] an appeal from the rejection of his application for enrollment along with a written statement specifying why he/she believes that the decision was incorrect.  The Pacific Regional Director shall review the decision of the Executive Committee and the written appeals statement submitted by the applicant and *make a recommendation to the Executive Committee as to whether it should uphold or change its decision and stating the reasons for the recommendation.*  When upon review the Director is satisfied that the appellant meets the provisions of Section 1, he shall so state in writing to the Executive Committee and recommend that the Executive Committee enter the applicant's name on the membership roll.  If the Director determines that an applicant is not eligible for enrollment, he shall notify the Executive Committee in writing of his recommendation and the reasons therefore.  *Within thirty days of receipt of the recommendation of the Director, the Executive Committee shall meet and consider that recommendation and make a final decision on the appeal of decision.  The decision of the Executive Committee shall be final.*

                    *     *     *

C.     *The Courts of the State of California or of the United States shall not have jurisdiction over issues relating to enrollment in the Pala Band.*

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Prior to the foregoing changes made by Defendants, Pala's Original Enrollment Ordinance provided for oversight by the BIA over the enrollment process and provided that "[t]he decision of the Secretary on appeal shall be final and conclusive" with respect to enrollment appeals.   In addition, the Original Ordinance did not purport to exclude courts from considering issues relating to enrollments in Pala.

87.     To prevent the BIA from nullifying their Revised Enrollment Ordinance, Defendants further inserted the language in the Revised Enrollment Ordinance that:   "BE IT FURTHER KNOWN that *this revised ordinance shall become effective upon approval by the Executive Committee of the Pala Band of Mission Indians without further approval of the Secretary of Interior or his or her delegated representative*."

88.     Thus, through their adoption of the Revised Enrollment Ordinance, Defendants sought to take away any review of their decisions and any challenge to the Revised Enrollment Ordinance itself.   In so doing, Defendants attempted to ensure that they had absolute and complete control over the Tribe, since they now had the ability to arbitrarily and capriciously eliminate any Pala members from the Tribe at will.   Because any Tribal member who opposed them could be immediately disenrolled and thus lose all their Tribal privileges, including their right to vote and to petition, Defendants ensured that they would continue to stay in power and maintain their reign of dominance over the Tribe.

89.     On July 22, 2009, Defendants again revised Pala's enrollment ordinance (the "7/22/09 Revised Enrollment Ordinance").   The 7/22/09 Revised Enrollment Ordinance was substantially similar to the 12/12/05 Revised Enrollment Ordinance, except that whereas the 12/12/05 Revised Enrollment Ordinance stated that it was to establish regulations governing procedures for enrollment and for keeping the roll on a current basis, the 7/22/09 Revised Enrollment Ordinance added that it would establish "the requirements and regulations governing *membership*" as well.   Thus, Defendants purported to give themselves power to govern membership – not merely new enrollments – in the Tribe.

90.     In addition, the 7/22/09 Revised Enrollment Ordinance provided that the Executive Committee could grant applicants provisional membership into the Tribe to give an individual immediate eligibility for Tribal benefits, which was previously unavailable in the 12/12/05 Revised Enrollment Ordinance.  By making these revisions, Defendants gave themselves the additional power to add friends and political supporters as new Pala members at will, regardless of whether they actually qualified to be members.

**B.     Defendants Disenroll The Britten Descendants Without Due Process.**

91.     Once Defendants secured their power through the foregoing changes in the Tribal Constitution and the Revised Enrollment Ordinances on 7/22/09 and 12/12/05, Defendants were able to transform Pala from a tribe governed by its adult members, or the Tribal Council, to a tyrannical oligarchy.  This was especially important to the Defendants because as Pala became flush with cash from the casinos, Pala members began to raise questions.  Among other things, questions were raised concerning the propriety of Tribal elections, Defendants' financial dealings, Defendants' motives for entering into certain contracts on behalf of the Tribe, Defendants' personal use of the Tribal jet and other Tribal assets, and the construction of a raceway on the reservation that had not been approved by the General Council.  Indeed, certain Pala members who had raised questions in January 2009 concerning the construction of the raceway, who had asked to review the financials (and were told that they were not available for review), and who brought up at a General Council Meeting on June 9, 2010 the fact that Defendant Lattin should have been automatically removed from office because he was a convicted felon at the time he was nominated and ultimately took office, were banned by Defendants from attending Pala's General Council meetings and denied their per capita payments for one year.

92.     On November 6, 2009, one of the Defendants, Pala Vice Chairman Leroy Miranda, was arrested by the police for allegedly soliciting a male prostitute in an adult book store.  As a result of the incident, Miranda pled guilty to a misdemeanor charge of lewd conduct in February 2010.  Under terms of the plea, Miranda agreed to pay a fine, enroll in an AIDS education program, stay away from the adult book store, and wear an electronic monitoring device.

- 28 -

93.     In March 2011, the media reported on the incident and additionally reported that Miranda had violated his parole by failing to complete the electronic monitoring program.  After learning this news, King Freeman, a former Chairman of the Tribe and a descendant of Margarita Britten, began a petition effort to recall Miranda.

94.     Upon discovering that Freeman had dared to circulate a petition to remove defendant Miranda, Defendants conspired to disenroll Freeman's family, the Britten Descendants. In March 2011, Defendants caused Pala to withdraw its membership from the Intertribal Courts of Southern California ("Intertribal Courts").  Pala members would then have no recourse in tribal courts to address their grievances against Defendants once the Defendants began their wave of disenrollments.

95.     The Intertribal Courts are tribal courts set up by member tribes in Southern California.    Under the Inter-Governmental Agreement regulating its members, in order to withdraw membership from the Intertribal Courts, a tribe was required to provide the Chairperson of the Tribal Judicial Council of Southern California with at least a 30-day written notice accompanied by a written resolution passed by the tribal government authorizing the tribe's withdrawal from the Intertribal Courts.  Instead of providing official notice to withdraw from the Intertribal Courts, however, Pala Secretary/Defendant Lattin merely sent a letter in March 2011 to withdraw, and did not include any accompanying written resolution authorizing Pala's withdrawal in his letter.  Although the letter of withdrawal from defendant Lattin did not constitute sufficient notice and was not valid pursuant to the Governing Agreement between Pala and the Intertribal Courts, the Board of the Intertribal Courts nonetheless accepted Pala's abrupt withdrawal.  Pala's withdrawal from the Intertribal Courts was so rushed that, whereas it normally took approximately four to six months for a tribe to withdraw from the Intertribal Courts in order to ensure a smooth transition, Pala's withdrawal took about half that time.

96.     Defendants were eager to withdraw Pala from the Intertribal Courts as part of their scheme and conspiracy to deprive Plaintiffs of their civil rights and property rights.  The Intertribal Courts would have provided the parties with access to court hearings and appeals, and the

- 29 -

1  Intertribal Court's records would have been available to the public.  By withdrawing from the

2  Intertribal Courts, Defendants acted to ensure that they would be above the law and that Plaintiffs

3  would not have their day in court.  Accordingly, Defendants made sure that Plaintiffs had no legal

4  recourse.

5        97.     On May 2, 2011, Tribal Secretary Kilma Lattin received the petition initiated by

6  King Freeman to have a special meeting regarding the gross misconduct of defendant Miranda.

7  Although the petition garnered enough votes, according to a letter from Lattin, many of the Tribal

8  members who had signed the petition subsequently requested to have their names taken off the

9  petition such that it did not meet the minimum signatures required.  Accordingly, Defendants

10  disqualified the petition and a special meeting was never held to discuss the recall of Miranda.

11        98.     The recall effort by Freeman to challenge Pala's Executive Committee, however,

12  greatly upset Tribal Chairman/Defendant Smith.  During a heated General Council meeting, Smith

13  said to Freeman, "your kids are off the rolls."

14        99.     On May 26, 2011, without providing notice or hearing to the persons affected,

15  Defendants held a meeting during which they decided to disenroll eight Britten Descendants from

16  the Tribe – including three of Freeman's children and other relatives.  However, the next day, on

17  May 27, 2011, Chairman/Defendant Smith falsely assured some Pala members in a private

18  conversation that rumors of disenrollments were not true.

19       100.    On June 1, 2011, the eight Britten Descendants discovered through a letter from

20  Pala Secretary/Defendant Lattin that they had been disenrolled.  According to Lattin's letter, Pala's

21  Enrollment Committee – which was really the Executive Committee made up of the Defendants

22  because Pala did not have a separate Enrollment Committee – had determined that they were not

23  eligible for enrollment and, as such, the Enrollment Committee "wishes to take their names off the

24  Tribal rolls effective June 1, 2011."   The disenrollment of these eight Britten Descendants

25

26

27

28

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

terminated their Tribal citizenship, including their right to petition or to vote in Tribal elections, and their rights to all Tribal distributions and benefits.[6]

101.   The disenrollment and consequent disenfranchisement of the eight Britten Descendants by the Defendants was done without due process or equal protection, as required under Pala's Constitution, Pala's Original and Revised Enrollment Ordinances, the Indian Civil Rights Act, and other laws and statutes. Prior to being taken off the Tribal rolls, these eight Pala members received no notice that they were being considered for disenrollment, had no opportunity to present evidence or be heard, and were summarily disenrolled arbitrarily and capriciously. The Defendants acted outside the limits of their authority, and they violated the due process and civil rights of the Britten Descendants. Defendants effectively used Margarita Britten's blood quantum as a ruse to rid themselves of political enemies and adversaries.

---

[6] According to Lattin's June 1, 2011 letter, the disenrollments occurred after the Executive Committee reviewed the 1928 enrollment application of certain Britten Descendants. However, the 1928 applications could not serve as the basis for disenrollment. A letter from the BIA to Chairman/Defendant Robert Smith explained that "these [1928] applications do not denote tribal membership or enrollment" and that the applications were to be used only in connection with legislation enacted by Congress in 1928 which permitted Indians to bring suit against the United States to seek compensation for lands taken from them. Moreover, Pala's governing documents explicitly state that only the *1913* Allotment Rolls is to be used for enrollment purposes.

Lattin's letter also claimed that "proof" that the eight Britten Descendants should not be enrolled came from a July 29, 1985 letter by Tom W. Dowell ("Dowell"), then acting Area Director of the BIA. In that letter, Dowell stated that the records on file at the BIA's Southern California Agency and Sacramento Area Office could not substantiate that Margarita Britten was a 4/4 degree Indian. However, since Dowell's July 29, 1985 letter, the BIA has conducted an extensive investigation into Margarita Britten's blood degree, including obtaining various records and testimony and comparing the allotment roll housed with the Southern California Agency with the original 1913 allotment roll housed in Washington, D.C. Following this extensive investigation by the BIA, the Assistant Secretary of Indian Affairs – the highest federal authority in the BIA – concluded in a *final* decision that Margarita Britten was a full-blooded Pala Indian. As such, a subsequent June 7, 1989 letter from Dowell to Pala's Executive Committee states that the BIA's Central Office "concluded that Mrs. Britten's blood degree is fullblood." Because the BIA later substantiated that Margarita Britten was a full-blooded Pala Indian, the Defendants' reliance on an earlier letter from the acting Area Director of the BIA to justify their disenrollment of the Britten Descendants is completely baseless. Indeed, while Pala's Enrollment Ordinance provides that "new information" could be used to re-evaluate an existing or old application, the Dowell letter did not constitute "new information" and, in any event, was contrary to the BIA's ultimate finding after it had conducted a thorough investigation.

102.   On June 29, 2011, the eight disenrolled Britten Descendants appealed the Defendants' decision to the BIA.  However, Defendants had already cut off their Pala rights and benefits as of June 1, 2011, without awaiting the BIA's recommendation.

103.   Thereafter, a flyer regarding the Executive Committee's unjustified actions was distributed.  The flyer stated:

> ***OUTRIGHT LIES!***   There are many questions regarding the odd behavior of the Executive Committee.  Why does Chairman Smith keep telling members that the appeal for the eight he took off the rolls was not filed on time?  He has publicly stated this to many people, to the media and at the General Council meeting.  This is an outright lie!  The appeal was filed <u>in a timely manner</u> with the Pacific Regional Office of the BIA on June 29, 2011, two days before the 30 day deadline.  It is currently being reviewed by the BIA and the BIA has confirmed that it is in compliance with the time frame allotted by the tribal ordinance.

> Also, the information that Robert Smith handed out at the last General Council Meeting was filled with inaccuracies.  The appeal has about 13 supporting documents.  These are official documents upon which the BIA based the enrollment of the Margarita Brittain descendants.  These are the documents that adhere to our Articles of Association and Constitution.  None of these documents were ever used when the Executive Committee decided to disenroll the eight individuals.  If the Executive Committee acted appropriately in this situation, they would see that there are no reasonable grounds for disenrollment.  The bottom line is the Executive Committee is not adhering to our governing documents and they misappropriated their power to disenroll these eight people.

> ***Tribal members!  Beware!  If this Executive Committee continues to utilize illegal documentation to determine membership, not one of you will be safe!***   Our Articles of Association and Constitution state that our membership base roll is the 1913 Allotment rolls.  What the Executive Committee doesn't seem to understand is that by illegally using the 1928 Indian Judgment Rolls (**the tribe has never** used the 1928 Indian Judgment Rolls to determine membership), they are opening a HUGE "can of worms" as there are many issues that will arise for many families with the tribe.  **We believe that everyone should be treated the same, without prejudice.**  With that said, if the Executive Committee continues along this path, then there is damning evidence in those 1928 Indian Judgment rolls that would

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

affect **many** tribal members in a negative way. The bottom line is that the 1928 Indian Judgment Rolls are filled with errors, mistakes and some very eye opening truths. It's no secret that Margarita Brittain's descendants lost their blood quantum by those very same 1928 Indian Judgment Rolls; her descendants appealed to the BIA on this matter, the BIA investigated and made a final decision on this matter and the Tribe voted in 1985 to change her descendant's blood quantum back to the correct blood quantum. The bottom line is, the tribe should just adhere to our Articles of Association and Constitution, which states that the 1913 Allotment Roll is the base roll and stop playing games with these innocent people.

*People want to know how can the Executive/Enrollment Committee disenroll only eight family members and not the rest of family who are 1/16th descendants?* This is how: Robert Smith has turned this "General Council" tribe into a **dictatorship**. He and his Executive Committee are abusing their power in the most frightening way. It is clear that Margarita Brittain is still recognized as 4/4 Cupeño and only eight of her descendants are being targeted by the Executive/Enrollment Committee for persecution. We know that Robert and certain committee members are abusing their leadership powers in an attempt to hurt King Freeman and to control him (all because of a personal grudge). Robert and crew have treated these eight with prejudice and this is clearly an outright act of discrimination. The reason why Robert Smith and his gang have not gone after the rest of the descendants is because he wants to hurt King, his family and keep him in his "place." These actions taken by this Executive Committee are unconstitutional and wrong.

Chairman Smith stated at the General Council Meeting "That's it! And it's over!" Chairman Smith, you need to know that it's not over yet! It's just the beginning ...

[Emphasis in original]

104. On September 30, 2011, obviously angered by the contents of the flyer which challenged the decision of the Executive Committee to disenroll the eight Britten Descendants, Chairman/Defendant Smith sent a letter to all enrolled adult members of the General Council, retorting:

As your Tribal Chairman of The Pala Band of Mission Indians, it is imperative that I bring an issue to you as members of the General Council. Reyes "King" Freeman continues to handout Tribal information to everyone that steps foot in his Pala Store. He has distributed information in the past that depicts lies and attacks

- 33 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

the character of our Executive Council here in our Reservation. This latest flyer is not only threatening but full of lies that he continues to spew out to the Media, Members and non-Members in our Community.

King Freeman has lived on his own lies for over 20 years as a member in our Band and in our community.  The Pala Band of Mission Indians voting membership need to take a firm stand and stay strong as an entity and not allow this to continue. *He wants the rest of his family who are 1/16 descendants, disenrolled!!! Don't take my word for it, see his flyer!!!*

Please review the following:  In the constitution adopted by the voting membership in November 1994,

> Section 3:  Membership Roll states:
> The Executive Committee shall keep membership roll current.

> Section 4:  Loss of Membership states:
> Procedures for disenrollment if any will be established in an ordinance as part of the Enrollment Ordinance.  Such procedures shall provide that the member receives due process and equal protection as required by the Indian Civil Rights Act.

*We don't need this kind of Attention that King Freeman is drawing to our tribe and we surely don't deserve this type of harassment from a member in our General Body that gives this information to local papers of which he has done more than once.*

The purpose and powers of the Pala Band of Mission Indians shall be to protect and promote the welfare and best interest of the members of our Band and to protect and exercise the Pala Band's inheriting rights as a Federally-recognized Indian tribe.  Please join in with me to stand firm on our Constitutional rights for all members involved.

Submitted by,

Robert H. Smith
Tribal Chairman
Pala Band of Mission Indians

- 34 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

105.     On October 24, 2011, various Britten Descendants received a letter from Smith which stated: "The enrollment committee needs to update enrollment files. There were gaps in the information we have on file, and particular questions arose over the blood quantum of Margarita Britten." The letter, which merely notified the recipients that the enrollment files needed to be "updated" did not apprise them that they were being considered for disenrollment or advise them of any disenrollment proceedings.

106.     On February 1, 2012, carrying out his threat to purge the Tribe of the rest of Freeman's relatives, Chairman Smith and the other Defendants expelled 154 other Britten Descendants from Pala. Together, these disenrolled Pala members account of approximately 15 percent of the Tribe's population. These individuals will no longer be able to vote in Tribal elections, to participate in Tribal Council meetings, or to petition for the removal of any of the Defendants. In addition, their per capita payments and other benefits immediately ceased. This occurred despite the fact there is nothing in the Tribe's governing documents allowing Defendants to immediately terminate members' rights and benefits.

107.     Like the first eight disenrollees, Plaintiffs and the other 154 Britten Descendants who were disenrolled on February 1, 2012, also did not receive due process before they were disenrolled. They received no notice they were being considered for disenrollment, did not have a hearing, and had no opportunity to present evidence. They only received a subsequent letter notifying them that they were no longer members of Pala.

108.     When the Tribe's spokesman, Doug Elmets, was asked by news reporters why these Pala members were disenrolled, he refused to explain the reason. Elmets, however, told reporters that under the Tribe's constitution, those who have been expelled can appeal to the federal Bureau of Indian Affairs. However, in reality, any such appeal was only illusory because Defendants had ensured that they had the final say on the enrollment decisions by allowing the BIA to only give a "recommendation" upon appeal and by closing off Plaintiffs' and other disenrolled Britten Descendants' access to the Intertribal Courts.

109.    On February 17, 2012, 79 members of Pala's General Council signed a petition to request a special meeting of the general council regarding the disenrollment of the Britten Descendants.  The petition stated:

> Pursuant to Section 3(B) of the Constitution of Pala Band of Mission Indians, Special Meetings, we the undersigned Tribal Members request a special meeting of the general council to discuss the disenrollment of the descendants of Margarita Britten, a documented full blood Cupeno Indian. We the undersigned disagree with the unjust enrollments of said descendants and wish for any disenrollments to seize [sic] immediately. We also would like for the enrollments to remain in accordance with the original 1913 allotment rolls of the Pala Band of Mission Indians for all families and the names of those on the list to disenroll remain tribal members indefinitely. We the undersigned Tribal Members in accordance with the Constitution request that the Executive Committee call a special meeting within fifteen (15) days from the date the petition is received by the Pala Tribal Secretary.

110.    In response to this petition, Chairman/Defendant Smith sent a letter to Tribal Members claiming that the "petition is circulating under misleading pretenses" and that "[t]he merits of this petition are false."  Moreover, despite the petition having garnered more than enough votes for a Special Meeting – in fact, almost three times more votes than the number of votes used to purportedly adopt the Constitution that gave Smith and the other Defendants indiscriminate disenrollment powers – in further disregard of the rights of members of the Tribe and in further abuse of their positions, Pala's Executive Committee rejected the petition and refused to call a meeting to discuss the disenrollment of the Britten Descendants, claiming that "it violates the Pala Constitution and Enrollment Ordinance."  Upon information and belief, Defendants are planning to institute a "treason ordinance" to put an end to any other attempts by Pala members to challenge their authority so that they could continue their reign of dominance.

## C.    Defendants Lack Authority to Revisit the Issue of Margarita Britten's Blood Degree

111.    Defendants also had no authority to disenroll the Britten Descendants because the issue of Margarita Britten's blood degree had already been conclusively determined.  Pala's General Council had previously voted to determine that Margarita Britten was a full-blood Indian.

Also, the BIA, after conducting an extensive investigation, had made a final determination that Margarita Britten was a full-blooded Pala Indian.

112.   On February 22, 1984, Pala's General Council – comprised of all members of Pala 18 years and older – voted to correct Margarita Britten's blood degree to 4/4 Pala Indian after unauthorized handwritten changes had been made to the membership rolls.  Because the issue of Margarita Britten's blood degree was voted on by Pala's General Council, it cannot be revisited over a decade later by Defendants, members of Pala's Executive Committee.

113.   Significantly, Pala's Constitution provides that the main governing body of the Tribe is the General Council, not the Executive Committee.  According to the Constitution:

> ARTICLE III – GENERAL COUNCIL
>
> Section 1      GOVERNING BODY
>
> *The governing body of the Pala Band shall be the General Council, which shall consist of all members of the Pala Band who are eighteen years of age and older.*
>
> \*      \*      \*
>
> Section 11    POWERS   AND   DUTIES   OF   THE   EXECUTIVE COMMITTEE
>
> *The Executive Committee shall have the following powers and duties . . .*
>
> A.      *Cause the effectuation of all ordinances, resolutions or other enactments of the General Council . . .*

Because the Executive Committee is required to effectuate the resolutions of the General Council, Defendants were required to implement the General Council's directives from its February 22, 1984 meeting – specifically, its resolution that Margarita Britten's blood degree was 4/4. Defendants had no power to arbitrarily decide otherwise.

114.   Furthermore, the BIA has repeatedly concluded that Margarita Britten was a full-blooded Pala Indian.  In letters to three of the descendants of Margarita Britten dated May 17, 1989, Assistant Secretary of Indian Affairs, Donald Asbra, stated that, after a thorough

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

investigation including sworn statements, family history cards and other documents, "*we have*
*concluded that Margarita Britten was a fullblood Indian.*  We are directing that the blood degree
of her descendants be reviewed and corrected accordingly. . . .  This decision is based on authority
delegated to me by the Secretary of the Interior and *is final* for the Department."

115.    Likewise, on September 11, 1989, in a letter to the then-Chairperson of Pala, Acting
Assistant Secretary of the BIA, Walter Mills, reiterated that "*the decision of the Assistant*
*Secretary – Indian Affairs is final for all purposes. . . .  The issue of Margarita Britten's blood*
*degree has been determined.*"

116.    In April, 1994, the Department of Interior also notified various descendants of
Margarita Britten that the Department had conclusively "determined that *Margarita Brittain*
*possessed 4/4 degree Indian blood.*"  The letter explained that "[o]ur Tribal Enrollment Specialist,
has completed extensive research to identify all descendants of Margarita Brittain and determine
the correct blood degrees involving five generations. . . . Our staff met with the Pala Business
Committee on March 2, 1994, and provided them with our findings and supporting documentation,
including tree charts.  We advised them that the correct blood degrees should also be noted on their
membership roll."   Because neither the Tribe nor its Executive Committee filed an action to
challenge or to appeal the final decision of the BIA regarding Margarita Britten's blood degree,
they are bound by the decision.

117.    Indeed, even Chairman/Defendant Smith has previously acknowledged that
Margarita Britten was a full-blooded Pala Indian.  On November 15, 1995, Barbara Gonzales-
Lyons, Vice Chairman of the Agua Caliente Band of Cahuilla Indians, asked Pala for verification
of certain members in order to correct Agua Caliente's tribal membership rolls.  The letter from
Gonzales-Lyons sought verification of the blood quantum of Margarita Britten's daughter, Casilda
Welmas; the blood quantum of Casilda's husband, Cayetan; and the blood quantum of Casilda's
children, Jose, Rufina and Miguel.  In response to that letter, defendant Smith, as Chairman of the
Pala Tribe, wrote:

> After researching our Tribal Enrollment Records, *we show*
> *Cayetan & Casilda Welmas each possess ½ degree Indian blood*

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

*as stated in the Pala Allotment Roll of November 3, 1913*.  Jose, Refina and Miguel Welmas also possess ½ degree Indian blood.

Because Margarita Britten had married a non-Indian, her daughter, Casilda Welmas, necessarily had ½ degree Indian blood.  As such, Smith had acknowledged that Margarita Britten was a full-blooded Pala Indian.

118.    Likewise, Stanley McGarr, who was then-Secretary of the Pala Tribe in 1995, also verified in a letter dated October 23, 1995 to the Agua Caliente Band that "[t]he Pala Allotment Roll (PAR) approved by the Secretary of the Interior November 3, 1913, and the Pala Census (PC) for the year 1919, *show Margarita Britten to be the following: . . . 4/4 Degree Indian Blood* (PAR).  Seven Children, Casilda, Miguela, Maria, Santiago, Esperanza, Juans and Martha (PAR).  All Children to be ½ Degree Indian Blood (PAR)."

119.    Because the issue of Margarita Britten's blood degree had been previously conclusively determined, the issue cannot be revisited.  Nothing in Pala's Constitution or Tribal ordinances allows Defendants to revisit blood quantum issues that had already been finally determined, and Defendants exceeded the authority the Tribe granted them and acted outside their authority in revisiting this issue in order to justify their unlawful disenrollment of the Britten Descendants.  Defendants cannot rewrite history at will to mask their personal agenda.

### D.    Defendants Exceed The Authority Granted Them Under Pala's Constitution And Enrollment Ordinance

120.    Additionally, Defendants exceeded their authority in disenrolling the Britten Descendants because they did not have power to do so under either Pala's Constitution or any of its ordinances.

121.    Even assuming the validity of Pala's Constitution, it did not authorize the Executive Committee to pass an ordinance empowering itself to remove persons from the Tribal rolls due to misrepresentation or omission contained in membership applications from the 1920s, or over eighty years ago.  As set forth in Article II, Section 2, of the Constitution:

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Section 2.  MEMBERSHIP ROLL

The Executive Committee shall keep the membership roll current annually by striking therefrom the names of persons who have relinquished in writing their membership in the Band and of deceased members upon receipt of a death certificate or other evidence of death, and by adding the names of children born to members who meet the requirements.

Consequently, the Executive Committee only had the power to only add or delete persons from the Tribal rolls as members die, become born, or as membership is relinquished.  It did not have power to delete members from the Tribal rolls for other reasons.

122.    Additionally, Article II, Section 4, of the Constitution provides:

Procedures for disenrollment, if any, will be established in an Ordinance or as part of the Enrollment Ordinance.    Such procedures shall provide that the member receives due process and equal protection as required by the Indian Civil Rights Act.

Accordingly, Pala's Constitution did not give authority to the Executive Committee to *initiate* disenrollments, which they did here – but only to set up *procedures* for disenrollments.  Moreover, the Constitution required that any disenrollment procedures must provide members with due process and equal protection – which Defendants failed to provide.   Thus, Defendants acted manifestly and palpably beyond their authority when they disenrolled the Britten Descendants.

123.    Furthermore, the Revised Enrollment Ordinances purporting to give Defendants power over the disenrollments were unauthorized.  At a General Council meeting on January 9, 2002, the Tribe considered whether enrollment and membership requirements should remain "as is for the next ten (10) years."  The "motion to approve moratorium on enrolment [sic] requirements for ten (10) years" was passed.  The moratorium thus restricted Defendants from taking any action with respect to any Pala member's status or to implement ordinances that gave themselves additional power over enrollments.  In addition, since the BIA had final approval over membership applications as of 2002, when the moratorium was passed, the BIA has final say on enrollments, not Defendants.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

124.   Also, the Revised Enrollment Ordinances adopted by the Defendants on 12/12/05 and 7/22/09 were only meant to apply to *new* and *future* enrollment applications. The Revised Enrollment Ordinances both state, in the first sentence describing the ordinance, that the ordinance is "[a]n ordinance to establish regulations and procedures governing enrollment of members *into the Band* and to maintain the roll on a current basis." These Ordinances also declared that, "the Executive Committee of the Pala Band, by adoption of this revised ordinance, *does not intend to alter or change the membership status of individuals whose membership has already been approved and who are currently listed on the membership roll of the Pala Band of Mission Indians . . . .*" Although the Revised Enrollment Ordinances provide that the Executive Committee can disenroll a person if such person has misrepresented or omitted information "that might have made him/her ineligible for disenrollment," this provision was clearly meant to apply only to *recent* applications. Indeed, the Revised Enrollment Ordinances' numerous references to *new* enrollments using language such as "Persons *to be* Enrolled" and "persons who are determined *to be* eligible for membership," coupled with the explicit declaration that the Revised Enrollment Ordinances are not intended to alter or change the membership status of individuals whose membership has already been approved and who are currently listed on the membership roll of the Pala Band of Mission Indians – demonstrate that the Revised Enrollment Ordinances were only supposed to regulate the enrollment of new or future members, *not* existing members who had long been admitted into the Tribe. Most certainly, they were not meant to revisit the veracity of enrollment applications from 1928 – or 84 years ago. Indeed, Annalee Trujillo, who had served on the Executive Committee, stated in a declaration that she had voted to approve the Revised Enrollment Ordinances because she understood that they were not intended to change the membership status of enrolled members and that she believed "no one already approved on the roll would be taken off the official federally approved membership roll."

125.   Additionally, the Revised Enrollment Ordinances provide that the Executive Committee can remove someone from the Tribal roll only where "an applicant or the person filing the application on his/her behalf misrepresented or omitted facts that might have made him/her

ineligible for enrollment . . . "  There was clearly no misrepresentation or omission by any of the Britten Descendants, since both Pala's Tribal Council and the BIA had each previously concluded that Margarita Britten was a full-blooded Pala Indian.

126.    The Revised Enrollment Ordinances further state that where an application is reevaluated because of a misrepresentation or omission, such "application shall be reevaluated *in accordance with the procedures for processing an original application*."  To process an original application, the Executive Committee was required to make an initial determination on the application before sending it to the BIA for its review and recommendation, and then the Executive Committee was supposed to approve or disapprove of the application only "[a]fter a response is received from the Bureau of Indian Affairs."  Here, Defendants' disenrollment of Plaintiffs and other Britten Descendants was unauthorized and improper because it was done before they had received a response from the BIA.

127.    Finally, Defendants had no authority to disenroll the Britten Descendants because at least two of the six Executive Committee members, Defendants Miranda and Lattin, should not have been serving on the Executive Committee when they participated in the disenrollment decision.   Pala's Constitution prevents a person from being nominated for the Executive Committee if he or she has been convicted of a felony or any other criminal offense, and it requires the removal of an Executive Committee member if the officer commits any crime or engaged in gross misconduct, as follows:

<div align="center">ARTICLE V – EXECUTIVE COMMITTEE</div>

<div align="center">*       *       *</div>

Section 2.      QUALIFICATIONS

B.      Before the names of a person who has been nominated can be put on that ballot, that person must complete a form provided by the Executive Committee and *certify under penalty of perjury that he/she has not been convicted of a felony or any other criminal offense* included above.  The Executive Committee will verify that there has been no such conviction(s).  The General Council may make an exception for vehicle related felony traffic offenses or for offenses which occurred more than ten years earlier.

*     *     *

Section 5.       VACANCIES

*If an officer shall . . . be found guilty of a felony in any State or Federal court . . . a vacancy in the office shall be automatically created. . . .*

*     *     *

Section 7.       *REMOVAL*

A.       Failure to attend three (3) consecutive meetings without valid excuse, including regular, emergency and special meetings; Provided that the member has received notice of the meetings;

B.       *Gross misconduct in office*;

C.       Incapacity from physical or mental disability, to the extent that he/she is incapable of exercising judgment about or attending to the business of the Executive Committee;

D.       *Conviction of a crime under Federal, State or Tribal Law while holding office*.

128.   In August 2003, Defendant Leroy Miranda, while serving on Pala's Executive Committee, was charged under California Penal Code ("PC") 245(A)(1) for assault with a deadly weapon (a felony), PC 417(A)(2) for brandishing a firearm (a misdemeanor), and PC M273A(A) for willfully harming and/or injury to child (a misdemeanor). He pled guilty and was convicted of all charges. Miranda violated probation in that instance. On November 6, 2009, Defendant Miranda was also arrested and charged with a lewd act under California Penal Code ("PC") 647(A). He pled guilty to the misdemeanor and was convicted. He was also later found to be in violation of his probation by the Court. Because Miranda had been convicted of various crimes while in office, he should not have been able to serve on the Executive Committee and thus had no authority to participate in the decisions to disenroll members of the Tribe. Moreover, despite the fact that he should have automatically been vacated from office, Miranda remains Pala's Vice-Chairman to this day.

- 43 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

129.   Likewise, Defendant Kilma Lattin had no authority to participate in the disenrollment decisions.  Public records indicate that on December 25, 2006, Lattin was cited for "assault with firearm on person" and for "threaten crime with intent to terrorize."  He was subsequently charged under PC 246.3 for willful discharge of a firearm in a negligent manner which could result in injury or death to a person, with special allegations made under PC 1192.7(c)(23) for personally using a deadly weapon – making it a "serious felony."  On February 7, 2012, Lattin's motion to reduce the charge to a misdemeanor was denied, and he was ordered "to stay at 100 yards away from victims and witnesses, except when conducting official tribal business and meetings."  On July 19, 2007, he withdrew his "not guilty" plea and pled "guilty" to the crime.  On September 10, 2010, the Court granted Lattin's request to reduce the charge to a misdemeanor after he had served three years of probation; however, the Court's order specifically stated that "This order does not permit a person prohibited from holding public office as a result of the conviction to hold public office."  Thus, Lattin also should not have been serving on Pala's Executive Committee when the Executive Committee disenrolled the Britten Descendants.

130.   Because at least two of the five Executive Committee members who had participated in the decision regarding the Britten disenrollments had criminal records, these disenrollments are absolutely invalid.  For the same reason, the Revised Enrollment Ordinances adopted by the Executive Committee on 12/12/05 and 7/22/09 are invalid because these Defendants should not have participated in the adoption of the Revised Enrollment Ordinances.

### E.   Plaintiffs Fail To Receive the Required Due Process or Equal Protection

131.   Defendants' disenrollment of the Plaintiffs and the Britten Descendants are also invalid because the disenrollees were deprived of due process and equal protection.

132.   Pala's Constitution mandates that *"[p]rocedures for disenrollment . . . shall provide that the member receives due process and equal protection as required by the Indian Civil Rights Act."*  The Constitution further emphasized that *"[t]he Pala Band shall provide all*

- 44 -
COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

*persons with due process and equal protection of the law required by the Indian Civil Rights Act*."

133.     The Indian Civil Rights Act ("ICRA"), referenced in Pala's Constitution, is codified at 25 U.S.C. §§ 1301-03.  The ICRA was enacted by Congress to prevent abuses tribal members had endured from the "sometimes corrupt, incompetent, or tyrannical tribal officials."  Under Section 1302(8) of the ICRA, "[n]o Indian tribe in exercising powers of self government shall - . . . deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law."  Because Defendants took away Plaintiffs' Tribal citizenship, voting rights, and property without providing them with due process as required under Pala's Constitution and the ICRA, they exceeded their authority and the Britten Descendants' disenrollments are invalid.

134.     Although Defendants purported to derive their authority to disenroll the Britten Descendants based on the Revised Enrollment Ordinances that Defendants themselves had adopted, Pala's Constitution requires that enrollment ordinances comply with the Constitution. Specifically, according to Pala's Constitution, "[t]he Executive Committee may from time to time amend and/or replace its existing Enrollment Ordinance with an Ordinance governing adoption, loss of membership, disenrollment, and future membership, *provided that such ordinances are in compliance with this Constitution*."  Because the Revised Enrollment Ordinances did not comply with Pala's constitutional requirements of due process by failing to provide procedures regarding notice, hearings and "true" appeals, these Ordinances are invalid.

135.     Furthermore, Plaintiffs and the other disenrolled Britten Descendants were deprived of equal protection.  Indeed, Defendants singled out the Britten Descendants for disenrollment, even though the blood degree of other families within the Tribe are also in question, including with respect to the descendants of Rosinda Nolasquez and Rumijio Lugo.  For example, although Rosinda Nolasquez is listed as "4/4" on the 1913 Pala Allotment Rolls, her 1928 application states that her grandfather was a Yaqui Indian, and she authored a book that states that her mother was considered "foreign lineage," meaning that she might have only had 1/4 Pala Indian blood.

Significantly, Pala Vice Chairman/Defendant Leroy Miranda is a Nolasquez Descendant. Likewise, Rumijio Lugo, a relative of Defendants Theresa Nieto and Dion Perez, was apparently born in Morongo and was not part of the original people on the Pala Reservation or the Cupeños who were removed from Warner's Springs, and thus it is questionable whether he was qualified to be a Pala.

### F.   The BIA Recommends That Disenrolled Britten Descendants Be Reinstated as Pala Members

136.   On February 24, 2012, following the appeal of the first eight Britten Descendants who were disenrolled by the Defendants, the BIA issued a recommendation.  Noting that their appeals had been timely filed, the BIA recommended that Pala keep these Britten Descendants on the Tribal membership roll because "*it has been proven that they possess the required degree of Indian blood*."   Specifically, the BIA's February 24, 2012 letter to counsel for the eight disenrolled members states, in relevant part, that:

> In a memorandum dated January 17, 1986 the Sacramento Area Office (now Pacific Region Office) requested the Assistant Secretary – Indian Affairs (ASIA) to determine the blood degree of Margarita Britten.  Sacramento Area Office records indicated her blood degree as 4/4 and recommended her blood degree to be increased to 4/4 degree Cupa Indian blood.  ASIA issued a decision on May 17, 1989 that Margarita Britten was a full-blood Indian, and that Ms. Majel possessed 1/16 Cupa Indian blood, and possessed the minimum blood degree required for enrollment. ASIA based this decision on following documents:  1913 Pala Allotment Roll, which indicates Margarita Britten as 4/4 degree of Indian blood, supporting evidence of relatives that applied for enrollment with the Band as well as relatives requesting a change to show the 4/4 degree of Indian blood, and statements by Carolina Nolasquez and other record supporting documents. *This decision was final for the Department of the Interior*.

> Based on the review of our records along with the fore-mentioned ASIA decision concluding Margarita Britten as being a fullblood Indian, *our recommendation to the Band is to change its disenrollment decision of the eight individuals and to have them remain on the tribal membership roll of the Pala Band of Mission Indians*.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

137.    Even though the Revised Enrollment Ordinances provide that "[w]ithin thirty days of receipt of the recommendation of the Director, the Executive Committee shall meet and consider that recommendation and make a final decision on the appeal of decision," Defendants have yet to meet to make a final decision on the BIA's recommendation to reinstate membership of the eight Britten Descendants.  Indeed, for all intents and purposes, Defendants had already made their "final" decision even before receiving the BIA's recommendation upon appeal, because they had already stripped these disenrollees of all of their Tribal rights and benefits without authority.

138.    On June 7, 2012, the BIA issued another recommendation letter based on an appeal filed by 53 of 154 Britten Descendants who were disenrolled in the second wave of disenrollments. The letter from the BIA states, in relevant part, that:

> Based on our review of the documents provided by the individuals requesting review and the record in our office, it is our recommendation that these individuals remain enrolled with the Band *as there was no evidence provided to support the disenrollment of these individuals*.    Therefore, *our recommendation to the Band is to continue to recognize the membership status of the individuals affected by the February 3, 2012, Executive Committee action.*[7]

139.    However, on June 5, 2012, even before the BIA had issued its recommendation, in flagrant disregard of the Revised Enrollment Ordinances requiring the Executive Committee to wait for the BIA's recommendation, the Executive Committee held a meeting where they determined their disenrollment of the 154 Britten Descendants was "final."

140.    Plaintiffs and their families have suffered, and continue to suffer, the loss of their tribal identities and their cultural heritage.   They have received "hate mail" from anonymous persons who have characterized themselves as the "real members" of the Tribe on the envelopes. Upon information and belief, some of the hate mail was sent by Andrew Smith, the brother of

---

[7] The Executive Committee held a Special Meeting and decided to disenroll the 154 Britten Descendants on February 1, 2012.   On February 3, 2012, they sent a letter to these Britten Descendants informing them of the decision.

Chairman/Defendant Robert Smith.  Plaintiffs and other Britten Descendants have been shunned and harassed by members of the Pala community.  They have lost homes, educational assistance, medical insurance, monthly per capita distributions, and trust accounts amounting in hundreds of thousands of dollars.  Their pain and tears will continue if there is no intervention.

## DEFENDANTS' MOTIVE AND WRONGDOING

141.    Defendants participated in the wrongdoing complained of herein in order to protect and perpetuate their positions and the compensation, power, perquisites and prestige they obtained and enjoyed thereby.  In addition, they participated in the wrongdoing in order to further enrich themselves and to prevent scrutiny of questionable transactions that they had caused the Tribe to engage in.  Further, their disenrollment of the Britten Descendants arose out of discrimination against a particular family and its racial lineage, as well as personal animus.

142.    Defendants received payments, power, prestige and other benefits by virtue of their membership on the Executive Committee and their control of the Tribe.  Each Defendant is the recipient of remuneration paid by the Tribe, the continuation of which is dependent upon their continued positions on the Executive Committee.  Although the amount of remuneration paid by the Tribe to Defendants is not known to Plaintiffs, Plaintiffs believe that Defendants derive substantial compensation and numerous other benefits from their positions.  In addition, each Defendant stands to benefit financially by removing Plaintiffs and other Britten Descendants from the Tribe because they will receive higher individual per capita distributions.  By purging their political enemies and adversaries from the Tribe, Defendants ensured that they would remain in control and domination over the Tribe, and continue to receive the benefits derived from their positions.  Defendants have thus benefited from the wrongdoing alleged herein and have engaged in such conduct to preserve their positions of control and the perquisites thereof.

143.    Defendants' elimination of Plaintiffs and other Britten Descendants from the Tribe ensured that Defendants would maintain their control and domination over the Tribe.  Indeed, in 2003, some Britten Descendants petitioned to request a Special Meeting to discuss inappropriate personal conduct by Chairman/Defendant Smith at the Pala Casino.  However, the meeting was

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

cancelled because Smith declared the petition signed by more than 90 Tribal members to be illegal and not prepared in accordance with the Tribe's Constitution.  The Britten Descendants have also questioned Defendants' financial dealings on behalf of the Tribe and why certain transactions were entered into without authorization by the Tribal Council.   In 2011, King Freeman, a Britten Descendant, also petitioned for the removal of Vice Chairman/Defendant Miranda for his criminal conduct.  This began the wave of disenrollments of the Britten Descendants, after Defendants had made sure that these disenrollees would receive no due process by way of appeals through the BIA, or hearings through the Intertribal Courts.  The disenrollment of the Britten Descendants by Defendants was their punishment for daring to speaking up against Defendants.  Similarly, former employees of Pala Casino, headed by Chairman Smith, were terminated when they complained to management that certain illegal and accounting irregularities were occurring in violation of rules set forth by the National Indian Gaming Commission.

144.    To eliminate challenges to their positions and scrutiny of their conduct, and to retaliate against King Freeman and his family, Defendants have stripped Plaintiffs of their Tribal citizenship by using Margarita Britten's blood degree as an excuse.  Plaintiffs have been and will continue to be deprived of their rights as members of the Tribe, including the right to petition; to vote in Tribal elections; to utilize Tribal resources and facilities; and to receive per capita payments, trust funds, home loans, health insurance, tuition assistance and other benefits.  Their lives have been turned upside down due to Defendants' wrongful conduct.

145.    Defendants have used their control and domination of the Tribe to unjustly deprive Plaintiffs of their civil rights.  Plaintiffs received no due process or equal protection with respect to their disenrollment from the Tribe.  Plaintiffs are unable to seek recourse from the Intertribal Courts because Defendants withdrew Pala from its participation.  The BIA cannot invalidate the Defendants' actions because the Defendants caused the BIA to be relegated to an advisory role, such that the BIA could only make recommendations but could not cause Defendants to reverse their decisions.  The domination of the Executive Committee by Defendants Smith and Miranda has resulted in a corrupt Tribal government incapable of fairly and adequately adjudicating

- 49 -

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1   Plaintiffs' claims.  Indeed, on February 24, 2012, upon the "appeal" by the first eight Britten

2   Descendants who were disenrolled, the BIA recommended to the Executive Committee that they

3   reverse their decision.  However, the Executive Committee has yet to act on its recommendation.

4   The BIA also recommended to the Executive that they reverse their decision regarding the other

5   Britten Descendants who were disenrolled in the second wave of disenrollments.  However, the

6   Executive Committee had already declared these disenrollment decisions to be "final" before it

7   even received the BIA's recommendation on their appeal.

8          146.    Defendants have also deprived Plaintiffs of equal protection and have discriminated

9   against the Britten Descendants.  For example, the Executive Committee has been asked to inquire

10  into the blood degree of Roscinda Nolasquez – the ancestor of Vice Chairman Leroy Miranda –

11  because there are several historical documents that showed that her grandfather was 4/4 Yaqui, and

12  therefore possessed no Cupa blood, making a huge impact in the blood quantum of her

13  descendants.   The request included a family tree and documents from the Central Office in

14  Washington D.C. stating that Yaqui blood is not considered Native blood.   Nonetheless, the

15  Executive Committee ignored this request to review the blood quantum and membership

16  qualification of the Nolasquez descendants, thus demonstrating that the Britten Descendants were

17  discriminated against and not treated equally.

18                          **SOVEREIGN IMMUNITY IS INAPPLICALBE**

19          147.    Sovereign immunity offers no protection for Defendants because they acted

20  manifestly and palpably beyond their authority in disenrolling Plaintiffs and other Britten

21  Descendants.

22          148.    Defendants did not have authority to disenroll Plaintiffs and the other Britten

23  Descendants because they exceeded the authority that the Tribe had granted them.  Defendants

24  purportedly derived their power to institute enrollment ordinances based on Pala's Constitution.

25  However, the Constitution was not valid, as it was adopted through a Resolution with the approval

26  of only 27 members rather than through a Tribal election where it was approved by a majority of

27  adult members, as required.

28

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

149.    Even assuming the validity of the Constitution, Defendants exceeded their authority because Defendants failed to provide the Britten Descendants with due process in connection with their disenrollments.  Pala's Constitution mandates that "The Pala Band shall provide all persons with due process and equal protection of the law required by the Indian Civil Rights Act (25 U.S.C. Section 1302)."  This requirement was not followed by Defendants.  In fact, Defendants subverted due process by foreclosing Plaintiffs' access to Intertribal Courts and any real appeals.

150.    In addition, Defendants lacked authority to disenroll Plaintiffs and the other Britten Descendants because two of the five members the Executive Committee who decided on the disenrollments had criminal records and should not have been serving on the Executive Committee.

151.    Defendants also had no authority under Pala's Constitution or its enrollment ordinances to disenroll the Britten Descendants because they could not revisit the issue of Margarita Britten's blood degree after Pala's General Council and the BIA had already determined that she was a full-blooded Pala Indian.  If anything, Defendants were required under Pala's Constitution to carry out the dictates of the Pala's General Council, and thus they should have been protecting the Britten Descendants' membership in the Tribe, instead of kicking them out.

152.    Further, pursuant to the moratorium passed by the Tribe on January 9, 2002, Pala's membership and enrollment requirements were supposed to remain "as is for the next ten (10) years."  Thus, Defendants were restricted from taking any action with respect to any tribal member's status or to implement ordinances that gave themselves additional power over enrollments.  Also, because the BIA had final approval over membership applications as of 2002, when the moratorium was passed, the BIA has final say on enrollments, not Defendants.

153.    Indeed, the fact that Pala's Executive Committee dominated by Defendants Smith and Miranda has thus far failed to act on the BIA's recommendation to re-enroll the first eight Britten Descendants – despite Pala's Revised Enrollment Ordinances requiring that the Executive Committee make a final decision within thirty days of receipt of the BIA's recommendation on the appeal – and that the Executive Committee had already pronounced the disenrollments of the 154

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

additional Britten Descendants to be final, even before the BIA issued a recommendation regarding the appeal of these other disenrollments – which also violates Pala's enrollment ordinance – further demonstrate Defendants' utter disregard of any law.  They have ignored any limits on their authority and exceeded their authority with respect to the disenrollments. Defendants' malicious disenrollment of the Britten Descendants was merely a ruse to further their personal agenda of eliminating political and personal enemies.

154.   Moreover, sovereign immunity does not apply because not only have Defendants exceeded the authority granted to them by the Tribe, but they have intentionally subverted the will of the Tribe.  The governing body of Pala is supposed be the General Council, consisting of all members of Pala who are eighteen years of age and older.  Despite the fact that 79 members of Pala's General Council signed a petition to request a special meeting to discuss the disenrollment of the Britten Descendants, Pala's Executive Committee, dominated by Defendants Smith and Miranda, have refused to hold the meeting.  In fact, Chairman/Defendant Smith sent a letter to Tribal Members claiming that the "petition is circulating under misleading pretenses" and that "[t]he merits of this petition are false."  By actively preventing a General Council meeting to discuss the disenrollment of the Britten Descendants, Defendant Smith demonstrated that he was not interested in allowing the General Council – the true sovereign here – to have a say in the disenrollment of the Britten Descendants.  Under these circumstances, covering Defendants under the cloak of sovereign immunity would turn the concept on its head.

155.   While an Indian tribe has a right to define its own membership for tribal purposes, the actions Defendants took were unauthorized by the Tribe and were motivated by reasons unrelated to the legitimate exercise of sovereignty relating to Tribal membership.  Although Defendants purported to act under the guise of Tribal authority, Defendants in fact were not acting within their official duties.  Defendants took the wrongful actions alleged herein for personal reasons – specifically, for personal retaliation, personal enrichment, and continued personal power over the Tribe – and they did so while ignoring the laws of the Tribe.

156. Defendants' disenrollment of the Britten Descendants was not about defining Pala's membership or composition of the Tribe's membership roster. Indeed, the definition of "who is Pala" for purposes of membership has remained unchanged. When Pala formally organized in November 1960, its Articles of Association defined Pala members as:

> (1) Those persons whose names appear on the Pala Allotment Rolls as approved by the Secretary of the Interior on April 12, 1895, and November 3, 1913, who are living on the date of approval by the Commissioner of Indian Affairs;
>
> (2) All living descendants of persons on the Allotment Rolls covered in Section 2.A(1) regardless of whether the original allottees are living or deceased, provided that such descendants have one-sixteenth (1/16) or more degree of Indian blood of the Band;
>
> (3) Those persons who have been adopted by the Band and such adoption has been approved by the Bureau of Indian Affairs.

Similarly, Pala's Constitution sets forth substantially the same definition for Pala membership, as follows:

> A. Those persons whose names appear on the Pala Allotment Rolls as approved by the Secretary of the Interior on April 12, 1985, and November 3, 1913, who were living on the date of the approval of the Pala Band's original Articles of Association by the Commissioner of Indian Affairs.
>
> B. All living descendants of persons on the Allotment Rolls covered in Section 1(A) above regardless of whether the original allotters are living or deceased, provided that they are direct lineal descendants and have one-sixteenth (1/16) or more degree of Indian blood of the Pala Band.
>
> C. Those persons who have been adopted by the Band and such adoption has been approved by the Bureau of Indian Affairs.

As Pala's membership definition has stayed the same, and the Britten Descendants had been Pala members for decades, Defendants' disenrollment actions were not about a Tribe exercising its sovereign right to determine who should be a member. Margarita Britten's name appears on the

- 53 -

1913 Pala Allotment Rolls, and her blood degree appears on the Allotment Rolls as "4/4" Pala Indian.  Margarita Britten and her descendants are indisputably rightful Pala members.  That fact has been conclusively determined.  Instead, Defendants' disenrollment actions arose out of greed and desire to control Pala's casino money and Defendants' abuse of power to eliminate personal enemies and to resolve family feuds.  Indeed, it is no coincidence that disenrollment of members by Indian tribes is a fairly recent phenomenon that have largely occurred in tribes involved in the casino business.

157.    Defendants began disenrolling Britten Descendants after an attempt was made by King Freeman, a Britten Descendant, to remove Vice Chairman/Defendant Miranda from his position. Shortly after Freeman's petition to recall Miranda, eight Britten Descendants – including several of King Freeman's children – were disenrolled.  After these first eight disenrollments occurred, a flyer was circulated arguing that the Executive Committee did not act appropriately in the disenrollments and questioning why the Executive/Enrollment Committee had disenrolled only eight family members and not the rest of the family who are 1/16th descendants.  In response, Chairman/Defendant Smith issued a letter to all adult members of the General Council stating, among other things, that "King Freeman has lived on his own lies for over 20 years as a member of our Band and in our community.  The Pala Band of Mission Indians voting membership need to take a firm stand and stay strong as an entity and not allow this to continue.  He wants the rest of his family who are 1/16 descendants, disenrolled!!!  Don't take my word for it, see his flyer!!!"  Shortly thereafter, Smith's threat to disenroll the rest of King's family who were 1/16 descendants became reality, when Defendants disenrolled 154 additional Britten Descendants from the Tribe.  These facts demonstrate that Defendants acted to disenroll the Britten Descendants not because they were performing their official duties as members of the Executive Committee in evaluating membership applications, but out of personal animus.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## COUNT I
### Against All Defendants for Conspiracy to Interfere with Civil Rights
### Pursuant to 42 U.S.C. §1985(3)

158.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

159.   Defendants conspired to interfere with Plaintiffs' civil rights.   Defendants participated in the alleged conspiracy to strip Plaintiffs of their right to petition, to vote in Tribal elections, and to cast votes for candidates other than Defendants.

160.   Defendants exceeded their authority and acted arbitrarily and capriciously in disenrolling Plaintiffs, and they did so without providing Plaintiffs with due process, meaningful appellate review, or equal protection, in violation of Section 8 of the Indian Civil Rights Act (25 U.S.C. §1302(8)) and Pala's Constitution, which incorporates the protections afforded by the Indian Civil Rights Act.   In addition, under the Indian Citizenship Act of 1924, all Indians born in the United States are Citizens of the United States and, as such, Plaintiffs were to be afforded the Constitutional protections provided to all other United States citizens, including the First Amendment right to petition and to speak freely and the Fifth Amendment right to due process.

161.   Defendants' actions were fueled by racial and class-based discriminatory animus toward a defined group of people – the descendants of Margarita Britten, who are Cupeños.  Plaintiffs are a protected class who are genetically part of an ethically distinctive subgroup of people.

162.   Defendants' actions were designed to prevent Plaintiffs, a defined class of people, from petitioning and voting so that Defendants could remain in their positions of power and control over the Tribe without scrutiny.

163.   Defendants' wrongful conduct has caused Plaintiffs to lose their Tribal citizenship, and has deprived them of their per capita distributions, health insurance, medical services, educational assistance, and other benefits.   Defendants' conduct has also served to deprive Plaintiffs of their cultural and social identities and their heritage.

164.   Plaintiffs have no tribal or administrative recourse because Defendants caused the Tribe to withdraw from the Intertribal Council of Southern California in March 2011; there are no Pala courts

- 55 -

able to address Plaintiffs' grievances; and an appeal to the BIA is useless because the BIA could only issue a recommendation to Defendants but cannot compel Defendants to change their previous decision. In fact, despite the BIA's recommendation to Defendants to re-enroll Plaintiffs and other Britten Descendants, Defendants have refused to do so.

165.   Plaintiffs have been injured in their person and property, and have been deprived of having and exercising their rights.

166.   As a direct and proximate cause of Defendants' misconduct, Plaintiffs have been injured and suffered damages.

<div align="center">

**COUNT II**

**<u>Against All Defendants for Violation of Equal Rights Under the Law<br>Pursuant to 42 U.S.C. § 1981</u>**

</div>

167.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

168.   Defendants, motivated by animus against the Britten Descendants who are Cupeños, have deprived Plaintiffs the full and equal benefit of all laws and proceedings under the Indian Civil Rights Act and Pala's Constitution, which incorporates the rights in the Indian Civil Rights Act, by taking away Plaintiffs' property and rights without due process.

169.   Plaintiffs were targeted and discriminated against by Defendants. Defendants discriminated against Plaintiffs and violated their equal rights by specifically selecting the Britten Descendants for disenrollment from Pala, but refusing to review other family lines within the Tribe. Defendants violated the Britten Descendants' equal rights under the law.

170.   Plaintiffs are a protected class who are genetically part of an ethically distinctive subgroup of people.

171.   As a direct and proximate cause of Defendants' misconduct, Plaintiffs have been injured and suffered damages.

## COUNT III

### Against All Defendants for Conversion

172.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

173.    Plaintiffs had an ownership and/or property interest in money and benefits provided by Pala.  Plaintiffs are Pala members who individually received approximately $150,000 per year from the Tribe in per capita payments, in addition to other benefits including health care and education expenses.  Further, Plaintiffs' minor children are beneficiaries of trust accounts set up by Pala.

174.    Defendants wrongfully interfered with and unlawfully exercised domination and control over Plaintiffs' property when they intentionally and knowingly wrongfully disenrolled Plaintiffs from Pala and appropriated the money and property for themselves.  In addition, Defendants will continue to take and detain Plaintiffs' money and property which, had it not been for Defendants' misconduct, would have been paid to and/or provided as benefits to Plaintiffs until their death.

175.    As a direct and proximate result of the conversion by Defendants, Plaintiffs have suffered and continue to suffer general and special damages of at least $80 million.

176.    The conversion was executed by the Defendants with specific, malicious, and willful intent to injure the Plaintiffs and to benefit the Defendants.  Accordingly, Defendants, individually and/or collectively should pay Plaintiffs the amount that was wrongfully converted and punitive damages in an amount to be determined at trial.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## COUNT IV

### Against All Defendants Against All Defendants for Tortious Interference with Prospective Economic Advantage

177.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

178.    Defendants were aware that there was an economic relationship between Pala and the Plaintiffs and that Pala provided, and was expected to provide in the future, per capita payments, health insurance, medical care, tuition and educational assistance, and other economic benefits to Plaintiffs. Plaintiffs and Pala's economic relationship arose from the fact that Plaintiffs are Pala members and that, pursuant to Pala's Amended Plan for Allocation of Gaming Revenue, submitted under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §2701 et seq., Pala was required to utilize gaming funds for individual per capita payments to its members and to provide for the general welfare of the Tribe and its members.

179.    Defendant wrongfully disenrolled Plaintiffs from the Tribe without basis in order to intentionally disrupt the relationship between Pala and the Plaintiffs, and the disruption of the relationship in fact occurred.

180.    The economic benefit from Pala to Plaintiffs had been, and would have continued to be, realized if it were not for the deliberate disruption by Defendants.

181.    As a direct and proximate cause of Defendants' misconduct, Plaintiffs have been injured and suffered damages.

## COUNT V

### Against All Defendants for Group Defamation

182.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

183.    Within the Native American Indian society, tribal authenticity is important. Those who are not considered authentic Indians are often discriminated against, ridiculed, or shunned by other Indians.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

184.   Defendants published a statement of fact – specifically, that Margarita Britten was not a full-blooded Pala Indian and that her descendants are not Pala – that subjected Plaintiffs to hatred and contempt, and which caused them to be shunned and avoided or has injured them in their occupation.   Defendants' statement concerning Margarita Britten and her descendants was false.   Defendants communicated this statement to Pala tribal members and others.

185.   Defendants' communication has harmed the reputation of Plaintiffs, has lowered Plaintiffs in the estimation of the Pala and Native Indian communities, and has deterred Pala members and other Native Indians from associating with Plaintiffs.   Plaintiffs have been defamed in the eyes of the Pala and Native Indian communities.

186.   Defendants' communication has also caused Plaintiffs to lose monetary distributions from Pala, trust funds for their children, home loans, scholarships, medical services, career opportunities, and other rights and benefits.

187.   Defendants acted at least negligently with respect to the truth of their statement concerning Margarita Britten and her descendants, if not willfully and maliciously.

188.   As a direct and proximate cause of Defendants' false statement, Plaintiffs have been injured and suffer from damages.

### COUNT VI

### Against All Defendants for Civil Conspiracy

189.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

190.   Defendants have engaged in a civil conspiracy with respect to Counts II through V.

191.   Defendants and their co-conspirators have acted in combination to wrongfully and illegally take away the per capita payments, trust fund accounts and benefits, as well as the cultural heritage, of Plaintiffs who are properly members of Pala.

192.   The conspiracy by the Defendants was committed with malice and specific intent to harm Plaintiffs and other Britten Descendants.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

193.    Defendants have been unjustly enriched by their conspiracy to illegally disenroll the descendants of Margarita Britten.  Plaintiffs and other Britten Descendants who were wrongfully disenrolled by Defendants have been damaged as a result of such conspiracy.

194.    As a direct and proximate cause of the civil conspiracy of the Defendants, Plaintiffs and the other Britten Descendants who have been disenrolled have been injured and damaged in an amount not yet determined and are entitled to the recovery of such actual damages.

195.    Because of Defendants' malicious and intentional conspiracy to harm Plaintiffs, Plaintiffs seek, in addition to any actual damages awarded, the imposition of punitive damages against the Defendants in an attempt to deter Defendants (and others similarly situated as Defendants) from engaging in this type of conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant relief as follows:

(1)    Enter a judgment against Defendants setting forth specific findings that the Defendants have:

    (a)    Engaged in a civil conspiracy to deprive Plaintiffs of their rights and property, and did so knowingly, intentionally, and with malice;

    (b)    Violated Plaintiffs' equal rights under the law;

    (c)    Tortiously interfered with Plaintiffs' economic relationship with Pala;

    (d)    Wrongfully converted Plaintiffs' rights in money and property; and

    (e)    Published a false statement that has harmed Plaintiffs;

(2)    Enter a declaratory judgment that the Defendants' improper disenrollment of Plaintiffs constitutes violations of their civil rights;

(3)    Enter a permanent injunction to invalidate Defendants' wrongful disenrollment actions;

(4)    Enter an order declaring the wrongful disenrollment of Plaintiffs by Defendants to be null and void;

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(5)     Enter an order requiring Defendants to pay back the money and lost benefits that were withheld and/or taken away from Plaintiffs while they were wrongfully disenrolled;

(6)     Enter an order for compensatory damages against the defendants for violations of Plaintiffs' rights in an amount appropriate to the proof adduced at trial;

(7)     Enter an order for punitive damages against Defendants for causing, approving and/or ratifying the disenrollment of the Plaintiffs, and for the consequential loss of money, property, and heritage;

(8)     Award Plaintiffs the costs and disbursements of pursuing this action, including reasonable attorneys' and experts' fees; and

(9)     Grant such other and further relief, including all appropriate equitable relief, as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:      July 3, 2012                    THE LIN LAW FIRM
                                              A PROFESSIONAL LAW CORPORATION
                                            ELIZABETH LIN


                                            _____
                                            ELIZABETH LIN

                                            2705 S. Diamond Bar Blvd.
                                            Suite 398
                                            Diamond Bar, CA  91765
                                            Telephone: (909) 595-5522
                                            Facsimile:  (909) 595-5519
                                            Elizabethl@thelinlawfirm.com

                                            *Counsel for the Plaintiffs*

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS