1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

RONALD D. ALLEN, JR., et al.,

CASE NO. 12cv1668-WQH-KSC

12

Plaintiffs,

ORDER

13

vs.

14

ROBERT H. SMITH; LEROY H. MIRANDA, JR.; KILMA S. LATTIN; THERESA J. NIETO; DION PEREZ,

15
16

Defendants.

17

HAYES, Judge:

18

The matter before the Court is the Amended Motion to Dismiss (ECF No. 17) filed by Defendants Robert H. Smith, Leroy H. Miranda, Jr., Kilma S. Lattin, Theresa J. Nieto and Dion Perez ("Defendants").

19
20

## PROCEDURAL BACKGROUND

21

On July 3, 2012, twenty-seven former members of the Pala Band of Mission Indians ("Plaintiffs") filed a Complaint against Defendants, seeking monetary damages and declaratory and injunctive relief. (ECF No. 1). Plaintiffs assert the following claims for relief to remedy their disenrollment from the Pala Tribe: (1) conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985(3); (2) deprivation of equal rights under the law, in violation of 42 U.S.C. § 1981; (3) conversion; (4) tortious interference with prospective economic advantage; (5) defamation; and (6) civil conspiracy. *Id.* at 56-61.

22
23
24
25
26
27
28

On August 30, 2012, Defendants filed the Amended Motion to Dismiss[1] (hereinafter "Motion to Dismiss") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(b)(7). (ECF No. 17). On October 15, 2012, Plaintiffs filed an opposition. (ECF No. 18). On October 29, 2012, Defendants filed a reply. (ECF No. 23).[2]

On March 1, 2013, the Court held oral argument on the Motion to Dismiss. (ECF No. 35).

## ALLEGATIONS OF THE COMPLAINT

"Pala is located on a 12,000-acre reservation east of Interstate 15 and south of Temecula." (ECF No. 1 at 22). Plaintiffs are descendants of Margarita Britten, who was identified on the Pala Band of Mission Indians' ("Pala Tribe") original 1913 allotment roll as 4/4 degree Pala Indian blood. *Id.* at 23. The Pala Tribe "is supposed to be governed by its General Council, consisting of all adult members eighteen years and older. The General Council elects an Executive Committee comprised of six elected officials with two-year terms that includes the chairman, vice chairman, treasurer, secretary, and two council persons." *Id.*

On November 6, 1960, the Pala Tribe officially adopted the Pala Articles of Association, previously approved by the Commissioner of Indian Affairs on March 7, 1960. *Id.* Section 2(A) of the Articles of Association, which defined tribal membership, provided:

> (1) Those persons whose names appear on the Pala Allotment Rolls as approved by the Secretary of the Interior on April 12, 1895, and November 3, 1913, who are living on the date of approval by the Commissioner of Indian Affairs;

---

[1]On August 29, 2012, Defendants filed a Motion to Dismiss. (ECF No. 16). The following day, Defendants filed the Amended Motion to Dismiss, which states: "Document amended only to correct formatting errors caused in PDF conversion." (ECF No. 17 at 1).

[2]On December 17, 2012, Plaintiffs filed a Notice of Recent Authorities in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. (ECF No. 26 (citing *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 928 (D.C. Cir. 2012); *Maxwell v. Cnty. of San Diego*, 697 F.3d 941 (9th Cir. 2012))). On December 19, 2012, Defendants filed an opposition. (ECF No. 28).

On February 19, 2013, Plaintiffs filed a Notice of Additional Recent Authorities in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. (ECF No. 31 (citing *Maxwell v. County of San Diego*, 10-56671, 2013 WL 542756 (9th Cir. Feb. 14, 2013); *Salt River Project Agr. Imp. & Power Dist. v. Lee*, CV-08-08028-PCT-JAT, 2013 WL 321884 (D. Ariz. Jan. 28, 2013))). On February 22, 2013, Defendants filed an opposition. (ECF No. 33).

1

> (2) All living descendants of persons on the Allotment Rolls covered in Section 2.A(1) regardless of whether the original allottees are living or deceased, provided that such descendants have one-sixteenth (1/16) or more degree of Indian blood of the Band;

2

3

> (3) Those persons who have been adopted by the Band and such adoption has been approved by the Bureau of Indian Affairs.

4

5   *Id.* at 22-23.

6      On November 26, 1961, the Pala Tribe enacted an enrollment ordinance which

7   established "regulations and procedures governing the enrollment of members into the Tribe

8   and to maintain the roll on a current basis (the 'Original Enrollment Ordinance')." *Id.* at 23.

9   The Original Enrollment Ordinance "provided numerous safeguards regarding enrollment and

10  membership in Pala." *Id.*  Pursuant to the Original Enrollment Ordinance:

11

> [A]ny person whose application for Pala membership had been rejected by the Executive Committee [of the Pala tribe] could appeal to the Area Director of the BIA. The Area Director shall forward to the Commissioner of Indian Affairs the appeal, supporting data, his recommendation, and the report and recommendation of the Executive Committee.  If the Commissioner determines that the appellant is not eligible for enrollment, he shall notify the appellant in writing of his decision and the reasons therefor.  If the application is rejected by the Commissioner, the appellant has 30 days from the mailing of the notice to file an appeal with the Secretary of the Interior, whose decision on appeal shall be final and conclusive.

12

13

14

15

16  *Id.*

17

18     "[I]n the 1980s, after a thorough and extensive investigation – including a review of

19  sworn statements, government records, family history cards, and other evidence – the Bureau

20  of Indian Affairs ('BIA') ... ruled that Margarita Britten was a full-blooded Pala Indian.  The

21  BIA has repeatedly reiterated its conclusion that this ruling ***was final***." *Id.* at 9.  In 1984,

22  "Pala's General Council ... voted on and approved a resolution to correct Margarita Britten's

23  blood degree to reflect that she was a full-blooded Pala Indian." *Id.*

24     In 1987, Defendant Robert H. Smith "became Chairman of the Pala Tribe." *Id.*

25  Defendant Smith, as Chairman, "began to take actions to secure his power over the Tribe and

26  its members, particularly as the Tribe became involved in Indian gaming and became wealthy

27  from casino money." *Id.*

     On November 22, 1994, the Pala Tribe "revised its Articles of Association into a

28

constitution, as [Defendant] Smith convinced the Tribe that it was necessary to do so in order for Pala to participate in Indian gaming." *Id.* In June of 1995, the Bureau of Indian Affairs ("BIA") reviewed the proposed constitution, which it "returned with recommendations for consideration." *Id.* at 23-24. "On or about November 1997, a final draft of the revised constitution was completed." *Id.* at 24.

On November 19, 1997, Resolution 97-36 "was passed ... to 'adopt the Pala Tribal Constitution [hereinafter 'Constitution'] to supersede the Articles of Association.'" *Id.* Resolution 97-36 "was only approved by a vote of 27 'For' and 0 'Against' in a Special Meeting – barely satisfying the quorum of at least 25 voters necessary to validate actions by the General Council." *Id.* at 25.

"[P]ursuant to the Indian Reorganization Act [of 1934 ('IRA')] and the Pala's Constitution itself, approval by a majority of the voters in a duly called election was required for Pala's Constitution to become effective." *Id.* at 24-25 (quoting 25 U.S.C. § 476(a)). Prior to disenrollment of Britten's descendants, the Pala Tribe "had approximately 900 enrolled members." *Id.* at 22. "[A]pproval by at least 300 or so adult voters would have been necessary to ratify the Constitution." *Id.* at 25.

> Since Pala's Constitution was not ratified by a majority vote of the adult members of Pala, it is invalid. Indeed, in response to a Freedom of Information Act ('FOIA') request to the BIA for any documents 'proving compliance with Section 476(a) described above, including the date a special election was authorized, called and conducted by the Secretary that resulted in the ratification of the Tribe's Constitution,' the BIA responded that it could not locate any such documents after having conducted a thorough search of its files – thus confirming that no such election to ratify the Pala Constitution had occurred. Because a majority vote ratifying Pala's Constitution did not occur, the Constitution was not properly adopted by the Tribe and therefore is not the governing document of the Tribe. Instead, Pala is still governed by its original Articles of Association.

*Id.* "The fact that Pala's Constitution is invalid is substantiated by other evidence." *Id.* For example, "Pala's Tribal Gaming Ordinance enacted on February 14, 2000 states that the Tribe is governed by its Articles of Association, not by its Constitution...." *Id.* The Pala Tribe's website, "as recently as February 2012, ... stated that '[t]he tribe is organized under Articles of Association approved in July 1961 and later amended in 1973 and 1980,' instead of stating

that it was governed by its Constitution." *Id.* at 26.

"Pala's new Constitution purported to give Pala's Executive Committee the power to 'amend and/or replace its existing Enrollment Ordinance with an Ordinance governing adoption, loss of membership, disenrollment, and future membership.' However, because the Constitution was not properly adopted, the Executive Committee in fact lacked such power." *Id.* at 24.

"In 2001, during the Tribal elections, King Freeman – a descendant of Margarita Britten and a personal enemy of Defendant Smith – was elected Vice Chairman of the Tribe." *Id.* at 26. However, Defendant Smith declared Defendant Leroy [H.] Miranda the winner of the election for Vice Chairman after "disallow[ing] a handful of votes...." *Id.* "That year, Defendant Miranda became Vice-Chairman of the Executive Committee, Defendant Theresa [J.] Nieto became Treasurer, and [D]efendant [Dion] Perez became and Executive Council member. In 2005, Defendant [Kilma S.] Lattin became Secretary of the Executive Committee." *Id.* "Once these individuals came to power as members of Pala's Executive Committee, they enacted ordinances that gave the Executive Committee even more power." *Id.*

On December 12, 2005, Defendants Smith, Miranda, Nieto, Perez and Lattin ("Defendants"), "as members of Pala's Executive Committee, revised Pala's Original Enrollment Ordinance (the '12/12/05 Revised Enrollment Ordinance'). In Section 6 of the 12/12/05 Revised Enrollment Ordinance, Defendants gave themselves the exclusive power to reevaluate approved membership applications...." *Id.* Section 6 of the 12/12/05 Revised Enrollment Ordinance provides:

> Should the Executive Committee subsequently find that an applicant or the person filing the application on his/her behalf misrepresented or omitted facts that might have made him/her ineligible for enrollment, his/her application shall be reevaluated in accordance with the procedure for processing an original application. Any decision of the Executive Committee that the member's name should be removed from the roll shall be subject to the affected member appealing that decision as specified herein.

*Id.* at 26-27. "Defendants attempted to ensure that there would be no true oversight of their

enrollment decisions by limiting any appeals of their enrollment decisions to only a *recommendation* by the BIA and specifically precluding review of their decision by state and federal courts...." *Id.* at 27 (quoting "Appeals of Eligibility Decisions Section 7.A.,C." of the 12/12/05 Revised Enrollment Ordinance). "To prevent the BIA from nullifying their Revised Enrollment Ordinance, Defendants further inserted the language in the Revised Enrollment Ordinance that: 'BE IT FURTHER KNOWN that this revised ordinance shall become effective upon approval by the Executive Committee ... without further approval of the Secretary of Interior or his or her delegated representative.'" *Id.* Through this process, "Defendants ensured that they would continue to stay in power and maintain their reign of dominance over the Tribe." *Id.*

On July 22, 2009, "Defendants again revised Pala's enrollment ordinance (the '7/22/09 Revised Enrollment Ordinance')." *Id.* Although the 7/22/09 Revised Enrollment Ordinance was "substantially similar to the 12/12/05 Revised Enrollment Ordinance," it also established "the requirements and regulations governing *membership*. Thus, Defendants purported to give themselves power to govern membership – not merely new enrollments – in the Tribe." *Id.* In the 7/22/09 Revised Enrollment Ordinance, Defendants also "gave themselves the additional power to add friends and political supporters as new Pala members at will, regardless of whether they actually qualified to be members." *Id.* at 29.

"Once Defendants secured their power through the foregoing changes in the Tribal Constitution and the Revised Enrollment Ordinances on 7/22/09 and 12/12/05, Defendants were able to transform Pala from a tribe governed by its adult members, or the Tribal Council, to a tyrannical oligarchy...." *Id.* "[A]s Pala became flush with cash from the casinos, Pala members began to raise questions." *Id.*

> Among other things, questions were raised concerning the propriety of Tribal elections, Defendants' financial dealings, Defendants' motives for entering into certain contracts on behalf of the Tribe, Defendants' personal use of the Tribal jet and other Tribal assets, and the construction of a raceway on the reservation that had not been approved by the General Council. Indeed, certain Pala members who had raised questions in January 2009 concerning the construction of the raceway, who had asked to review the financials (and were told that they were not available for review), and who brought up at a General Council

1
2
3

Meeting on June 9, 2010 the fact that Defendant Lattin should have been automatically removed from office because he was a convicted felon at the time he was nominated and ultimately took office, were banned by Defendants from attending Pala's General Council meetings and denied their per capita payments for one year.

4   *Id.*

5      In March of 2011, "Defendants caused Pala to withdraw its membership from the

6   Intertribal Courts of Southern California ('Intertribal Courts'). Pala members would then have

7   no recourse in tribal courts to address their grievances against Defendants once the Defendants

8   began their wave of disenrollments." *Id.* at 30. In order to withdraw membership from the

9   Intertribal Courts, a member tribe was required, pursuant to "the Inter-Governmental

10  Agreement," to provide 30 days written notice and have the tribal government pass a written

11  resolution approving such a withdrawal. *Id.* "Instead of providing official notice to withdraw

12  from the Intertribal Courts, however, Pala Secretary/Defendant Lattin merely sent a letter in

13  March 2011 to withdraw, and did not include any accompanying written resolution authorizing

14  Pala's withdrawal in his letter." *Id.* Defendant Lattin's letter of withdrawal "did not constitute

15  sufficient notice and was not valid pursuant to the Governing Agreement between Pala and the

16  Intertribal Courts...." *Id.* Defendants withdrew the Pala Tribe from the Intertribal Courts to

17  further "their scheme and conspiracy to deprive Plaintiffs of their civil rights and property

18  rights." *Id.* "The Intertribal Courts would have provided the parties with access to court

19  hearings and appeals, and the Intertribal Court's records would have been available to the

20  public.... Defendants made sure that Plaintiffs had no legal recourse." *Id.* at 30-31.

21      On May 2, 2011, Defendant/Tribal Secretary Lattin received Freeman's petition which

22  called for a "special meeting regarding the gross misconduct of defendant Miranda." *Id.* at 31.

23  The petition had enough signatures to mandate a special meeting. However, "according to a

24  letter from [Defendant] Lattin, many of the Tribal members who had signed the petition

25  subsequently requested to have their names taken off the petition such that it did not meet the

26  minimum signatures required." *Id.* The petition was "disqualified" by Defendants and a

27  special meeting was not held regarding the recall of Defendant Miranda. *Id.*

28

"The recall effort by Freeman ... greatly upset Tribal Chairman/Defendant Smith. During a heated General Council meeting, Smith said to Freeman, 'your kids are off the rolls.'" *Id.*  On May 26, 2011, without prior notice to those affected, Defendants held a meeting and decided to disenroll eight Britten descendants from the Pala Tribe.  Three of these eight members were relatives of Freeman.  *Id.*  "[O]n May 27, 2011, []Defendant Smith falsely assured some Pala members in a private conversation that rumors of disenrollments were not true."  *Id.*  "On June 1, 2011, the eight Britten descendants discovered through a letter from []Defendant Lattin that they had been disenrolled.  According to Lattin's letter, Pala's Enrollment Committee – which was really the Executive Committee made up of the Defendants because Pala did not have a separate Enrollment Committee – had determined that they were not eligible for enrollment and, as such, the Enrollment Committee 'wishes to take their names off the Tribal rolls effective June 1, 2011.'" *Id.*  These eight individuals were disenrolled "purportedly on the grounds that they did not have the 1/16 blood quantum necessary to be Pala members because their ancestor, Margarita Britten, was not a 4/4 degree Pala Indian." *Id.* at 6.  Their Tribal citizenship was terminated, including Tribal distributions and benefits. *Id.* at 31-32. "The disenrollment and consequent disenfranchisement ... was done without due process or equal protection, as required under Pala's Constitution, Pala's Original and Revised Enrollment Ordinances, the Indian Civil Rights Act, and other laws and statutes." *Id.* at 32.  These eight members received no notice, had no opportunity to be heard or present evidence, and "were summarily disenrolled arbitrarily and capriciously."  *Id*.  On June 29, 2011, these eight disenrolled members appealed to the BIA; however, their rights and benefits had already been terminated by Defendants without waiting for the BIA's recommendation. *Id.* at 33.

"Thereafter, a flyer regarding the Executive Committee's unjustified actions was distributed."  *Id.*  The flyer accused Defendant Smith of disseminating "OUTRIGHT LIES!" about Britten's descendants, and stated: "People want to know how can the Executive/Enrollment Committee disenroll only eight family members and not the rest of

family who are 1/16th descendants?  This is how: [Defendant] Smith has turned this 'General Council' tribe into a dictatorship.... We know that [Defendant Smith] and certain committee members are abusing their leadership powers in an attempt to hurt King Freeman...." *Id.* at 34.

On September 30, 2011, Defendant Smith, "obviously angered by the contents of the flyer," sent a letter to all adult members of the General Council, which stated, in pertinent part: "King Freeman has lived on his own lies for over 20 years as a member in our Band.... The Pala Band of Mission Indians voting membership need to take a firm stand and stay strong as an entity and not allow this to continue.  He wants the rest of his family, who are 1/16 descendants, disenrolled!!! Don't take my word for it, see his flyer!!!" *Id.* at 34-35.

On February 1, 2012, Defendant Smith and the other Defendants sent letters to 154 other Britten Descendants from Pala, "expelling" them from the Pala Tribe.  *Id.* at 36.  These individuals constituted approximately 15 percent of the Tribe's population.  *Id.*  These individuals will no longer be able to vote in Tribal elections, participate in Tribal Council meetings, or petition for the removal of any of the Defendants.  *Id.*  Their per capita benefits ceased immediately.  *Id.*  "This occurred despite the fact [that] there is nothing in the Tribe's governing documents allowing Defendants to immediately terminate members' rights and benefits." *Id.* at 36.  These individuals did not receive due process.  *Id.*

"Plaintiffs are some of the Britten Descendants who were disenrolled from the Tribe by Defendants on June 1, 2011, and February 1, 2012."  *Id.* at 7.

"On February 17, 2012, 79 members of Pala's General Council signed a petition to request a special meeting of the [G]eneral [C]ouncil regarding the disenrollment of the Britten Descendants." *Id.* at 37.  Defendant Smith "sent a letter to Tribal members claiming that the 'petition is circulating under misleading pretenses' and that '[t]he merits of this petition are false.'" *Id.*  "[D]espite the petition having garnered more than enough votes for a Special Meeting .... Pala's Executive Committee rejected the petition and refused to call a meeting to discuss the disenrollment of the Britten Descendants, claiming that '[the petition] violates the Pala Constitution and Enrollment Ordinance.'" *Id.*

1    "In disenrolling Plaintiffs and other Britten Descendants, Defendants acted palpably

2    and manifestly beyond their authority." *Id.* at 7. "As the events leading up to the

3    disenrollments demonstrate, these disenrollments were not about Defendants acting within

4    their official capacity to ensure that rightful members belong in the Tribe, but were instead

5    about Defendants' abuse of power by using the disenrollments to retaliate against political

6    enemies, keep themselves in their positions of power, and eliminate and punish members of

7    a particular familial and racial lineage who had dared to challenge their authority." *Id.*

8        Although Defendants purported to derive their power to disenroll the Britten
     Descendants from Pala's Constitution and the Revised Enrollment Ordinances
9        that they had enacted, Defendants in fact lacked such power. Among other
     things, Pala's Constitution was not validly adopted because it was not approved
10       by a majority of the voters in a duly called election, as required pursuant to
     Section 476(a) of the IRA and Pala's Articles of Association[], which had
11       preceded the Constitution....

12       Even assuming the validity of Pala's Constitution and the Revised Enrollment
     Ordinances enacted thereunder by Defendants, Defendants exceeded their
13       authority in disenrolling the Britten Descendants. Among other things, Pala's
     Constitution empowered members of the Executive Committee to add or delete
14       names from the Tribal rolls only for reasons of death, birth, or voluntary
     relinquishment of membership by Pala members. The disenrollments of the
15       Britten Descendants did not fall under any of these criteria.... Because the
     membership of Plaintiffs and other Britten Descendants had already been
16       approved, and they were listed on Pala's membership roll, Defendants had no
     power to remove Plaintiffs and other Britten Descendants from Pala's Tribal
17       rolls.

18       Additionally, Defendants had no power to disenroll Plaintiffs and the other
     Britten Descendants on the basis of Margarita Britten's blood degree. The 1913
19       Pala Allotment Rolls, which serve as the original 'base roll' for the Tribe, list
     Margarita Britten as having '4/4' degree Pala Indian blood.... [I]n the 1980's, [the
20       BIA] ruled that Margarita Britten was a full-blooded Pala Indian. The BIA has
     repeatedly reiterated its conclusion that this ruling ***was final***. In addition, in
21       1984, Pala's General Council – comprised of all Pala members 18 years and
     older – voted on and approved a resolution to correct Margarita Britten's blood
22       degree to reflect that she was a full-blooded Pala Indian. Because Defendants,
     as members of Pala's Executive Committee, were required to carry out the
23       resolutions of the General Council, they ***had to*** accept that Margarita Britten was
     a full-blooded Pala Indian, and could not arbitrarily reach a different conclusion
24       on their own to suit their personal agenda.

25       Further, Defendants lacked power to decide on the disenrollment of the Britten
     Descendants because at least two of the Defendants were charged and pled
26       guilty to crimes in office....

27       In addition, Defendants did not have authority to disenroll Plaintiffs because at
     a General Council meeting on January 9, 2002, the Tribe approved a moratorium
28       on membership requirements for ten (10) years. As such, Defendants were
     restricted from taking any action with respect to any tribal member's status or

implementing enrollment ordinances that gave themselves power over the Tribal membership. Further, since the BIA had final approval over membership applications as of 2002, the BIA had the final say on enrollments, not Defendants.

Moreover, Defendants exceeded the power granted them by the Tribe because, in extinguishing Plaintiffs' citizenship from the Tribe, Defendants violated the rights afforded to Plaintiffs under Pala's governing laws. Even assuming the validity of Pala's Constitution, the Constitution mandates that '[t]he Pala Band shall provide all persons with due process and equal protection of the law required by the Indian Civil Rights Act.'... The Indian Civil Rights Act, enacted by Congress in 1968, made many of the guarantees of the Bill of Rights applicable to Indian tribes in order to prevent abuses that many tribal members had endured from the 'sometimes corrupt, incompetent, or tyrannical tribal officials.' However, in violation of Pala's Constitution and the Indian Civil Rights Act, Plaintiffs were not provided with any due process or equal protection when they were disenrolled from the Tribe....

*Id.* at 7-10.

"Defendants conspired to ensure that Plaintiffs and other disenrolled Britten Descendants would have no recourse in any court or on appeal in connection with the wrongful and illegitimate disenrollments that violated due process and civil rights...." *Id.* at 10.

Just months before beginning their wave of disenrollments ... Defendants caused Pala to withdraw its membership from the [Intertribal Court].... Defendants had already taken away any meaningful appellate review of their enrollment decisions when they enacted Pala's Revised Enrollment Ordinances to provide that ... the BIA could not compel the Executive Committee to change or reverse its decision but could only make a recommendation to the Executive Committee as to whether it should uphold or change its decision....

*Id.* at 10. "Defendants' scheme and conspiracy to disenroll Plaintiffs and other Britten Descendants from the Tribe was willful and malicious. Defendants' disenrollment of Plaintiffs was not about defining Pala's membership, as Pala's membership requirements had not changed since the Tribe formally organized. Instead, Defendants' actions arose from their desire to eliminate political and personal enemies and for personal gain." *Id.* at 11. "Defendants stood to receive additional monetary distributions from the Tribe and would continue to stay in power to engage in questionable financial transactions without scrutiny." *Id.* "There are no tribal remedies to exhaust, and there is no process for review of Defendants' conduct. Plaintiffs, therefore, seek remedy from this Court." *Id.*

Plaintiffs seek the following relief against Defendants as individual tribal officials: (1) "a declaratory judgment that the Defendants' improper disenrollment of Plaintiffs constitutes

1  violations of their civil rights"; (2) "a permanent injunction to invalidate Defendants' wrongful

2  disenrollment actions"; (3) "an order declaring the wrongful disenrollment of Plaintiffs by

3  Defendants to be null and void"; (4) "an order requiring Defendants to pay back the money and

4  lost benefits that were withheld and/or taken away from Plaintiffs while they were wrongfully

5  disenrolled"; (5) "an order for compensatory damages against the Defendants for violations

6  of Plaintiffs' rights in an amount appropriate to the proof adduced at trial"; (6) "an order for

7  punitive damages against Defendants for causing, approving and/or ratifying the disenrollment

8  of the Plaintiffs, and for the consequential loss of money, property, and heritage"; (7)

9  reasonable attorneys' fees and costs; and (8) "other and further relief, including all appropriate

10  equitable relief, as this Court may deem just and proper." *Id.* at 61-62.

11        Plaintiffs allege that this Court has subject-matter jurisdiction over the federal law

12  claims pursuant to 42 U.S.C. § 1985(3), 42 U.S.C. § 1981, 28 U.S.C. § 1331, and 28 U.S.C.

13  § 1343(a). *Id.* at 12.  Plaintiffs allege that this Court has supplemental jurisdiction over the

14  claims arising under common law pursuant to 28 U.S.C. § 1367.  *Id.*

15                                       **ANALYSIS**

16  **I.     Applicable Standard**

17        Motions pursuant to Federal Rule of Civil Procedure 12(b)(1) assert a lack of subject-

18  matter jurisdiction over the dispute, and may be either a facial attack on the sufficiency of the

19  pleadings or a factual attack on the basis for a court's jurisdiction.  *White v. Lee*, 227 F.3d

20  1214, 1242 (9th Cir. 2000).

21        In determining the presence or absence of federal jurisdiction, the court applies the

22  "'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a

23  federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Cal.*

24  *ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 838 (9th Cir. 2004) (quoting *Caterpillar Inc. v.*

25  *Williams,* 482 U.S. 386, 392 (1987)).  When assessing subject-matter jurisdiction, the court

26  assumes the truth of all allegations in the complaint.  *See Castaneda v. United States*, 546 F.3d

27  682, 684 n.1 (9th Cir. 2008).  "If jurisdiction is lacking at the outset, the district court has no

28  power to do anything with the case except dismiss."  *Id.*

## II.   Contentions of the Parties

Defendants contend that the Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the Pala Tribe's sovereign immunity bars this Court from exercising subject-matter jurisdiction.  Defendants contend that this controversy involves tribal membership determinations falling "within the exclusive province of the Tribe," and that Plaintiffs cannot avoid the implications of tribal sovereign immunity by bringing these claims against tribal officials as opposed to the Tribe itself.  (ECF No. 17-1 at 15).

Plaintiffs contend that this Court has subject-matter jurisdiction.  Plaintiffs contend that "Defendants are individuals who exceeded their authority as Tribal officials by using enrollment as an excuse to retaliate against Plaintiffs."  (ECF No. 18 at 20).  Plaintiffs assert: "This is an important distinction because ... the Tribe – the true sovereign – had previously voted on and determined that Plaintiffs' ancestor, Margarita Britten, was a full-blooded Pala Indian.  Thus, Defendants intentionally subverted the will of the sovereign by unilaterally declaring that Margarita Britten was not a full-blooded Indian."  *Id.* at 19.

## III.   Discussion

"Sovereign immunity limits a federal court's subject matter jurisdiction over actions brought against a sovereign.  Similarly, tribal immunity precludes subject matter jurisdiction in an action against an Indian tribe." *Alvarado v. Table Mtn. Rancheria*, 509 F.3d 1008, 1015-16 (9th Cir. 2007).  "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *see also Oklahoma Tax Comm. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 505-06 (1991) (reaffirming the "longstanding doctrine of tribal sovereign immunity ... in order to promote Indian self-government, self-sufficiency, and economic development....").

"Tribal sovereign immunity 'extends to tribal officials when acting in their official capacity and within the scope of their authority.'" *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 727 (9th Cir. 2008) (quoting *Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492 (9th Cir. 2002)).  When tribal officials act "beyond their authority, they lose their entitlement to the

1   immunity of the sovereign." *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F. 2d

2   1269, 1271 (9th Cir. 1991) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)).

3       "Indian tribes have long been recognized as possessing the common-law immunity from

4   suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U.S. at 58. "When

5   the suit is brought only against state officials, a question arises as to whether that suit is a suit

6   against the State itself.... The Eleventh Amendment bars a suit against state officials when 'the

7   state is the real, substantial party in interest.'"[3] *Pennhurst State Sch. & Hosp. v. Halderman*,

8   465 U.S. 89, 101-02 (1984) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464

9   (1945)). "The general rule is that relief sought nominally against an officer is in fact against

10  the sovereign if the decree would operate against the latter." *Hawaii v. Gordon*, 373 U.S. 57,

11  58 (1963) (per curiam).

12      In *Maxwell v. County of San Diego*, — F.3d —, 10-56671, 2013 WL 542756 (9th Cir.

13  Feb. 14, 2013), family members of a shooting victim brought an action in federal court against

14  a tribal fire department and its paramedics, alleging that the individual paramedics

15  unreasonably delayed in obtaining medical treatment for the victim. The Court of Appeals for

16  the Ninth Circuit employed the "remedy-focused" analysis described above, concluding that

17  the paramedics did not enjoy tribal sovereign immunity "because a remedy would operate

18  against them, not the tribe." *Maxwell*, 2013 WL 542756 at *10. The Court of Appeals

19  explained:

20      'The general bar against official-capacity claims ... does not mean that tribal
        officials are immunized from individual-capacity suits *arising out of* actions they
21      took in their official capacities....' *Native Am. Distrib. Co. v. Seneca–Cayuga
        Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008) (emphasis in original).
22      'Rather, it means that tribal officials are immunized from suits brought against

23  _____

24  [3]"Since the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908), courts
    have recognized an exception to the Eleventh Amendment [sovereign immunity] bar for suits
25  for prospective declaratory and injunctive relief against state officers, sued in their official
    capacities, to enjoin an alleged ongoing violation of federal law." *Agua Caliente Band of
26  Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000). In deciding whether the
    relief sought is prospective or retrospective, courts must "look to the substance rather than to
    the form of the relief sought." *Papasan v. Allain*, 478 U.S. 265, 279 (1986).

27      In this case, Plaintiffs seek monetary, declaratory and injunctive relief that would
    restore them to the position they were in before they were disenrolled. Accordingly, the Court
28  concludes that Plaintiffs seek retrospective relief and that the doctrine of *Ex parte Young* is
    inapplicable to this case.

1   them *because of* their official capacities—that is, because the powers they
2   possess in those capacities enable them to grant the plaintiffs relief on behalf of
    the tribe.' *Id.* (emphasis in original).

3   *Id.* at \*11-\*12; *see also Shermoen v. United States*, 982 F.2d 1312, 1320 (9th Cir. 1992)

4   (explaining that in a suit brought against tribal officials, courts must consider whether "the

5   judgment sought would expend itself on the public treasurury or domain, or interfere with the

6   public administration, or if the effect of the judgment would be to restrain the [sovereign] from

7   acting, or compel it to act").

8       The *Maxwell* court distinguished the facts of its case from *Hardin v. White Mountain*

9   *Apache Tribe*, 779 F.2d 476 (9th Cir. 1985), a case where the plaintiff sued tribal council

10  members for allegedly ordering tribal police to eject plaintiff from tribal land. *Id.* at 478. The

11  Court of Appeals for the Ninth Circuit in *Hardin* concluded that the council members "had

12  act[ed] in their representative capacity and within the scope of their authority." *Id.* at 479.

13  "Holding the defendants [in *Hardin*] liable for their legislative functions would ... have

14  attacked the very core of tribal sovereignty." *Maxwell*, 2013 WL 542756 at \*12.

15      In *Imperial Granite*, an Indian tribe denied plaintiff access to a quarry that was owned

16  by plaintiff, a non-Indian, and located on the tribe's reservation. Plaintiff sued the tribe and

17  the tribe's officials for trespass, nuisance, and violation of the Indian Civil Rights Act (25

18  U.S.C. §§ 1301 et seq.). *Imperial Granite Co.*, 940 F. 2d at 1272. The Court of Appeals for

19  the Ninth Circuit concluded that sovereign immunity extended to the tribal officials because

20  there was "no ground stated in the complaint for finding that the tribal official defendants acted

21  beyond the scope of their lawful authority." *Id.* In reaching that conclusion, the Court of

22  Appeals stated:

23      As far as we are informed in argument, the only action taken by th[e] officials
        was to vote as members of the Band's governing body.... Without more, it is
24      difficult to view the suit against the officials as anything other than a suit against
        the Band. The votes individually have no legal effect; it is the official action of
25      the Band, following the votes, that caused Imperial's alleged injury....

26  *Id.* at 1271.

27      In this case, Plaintiffs allege that Defendants – elected members of the Pala Tribe's

28  Executive Committee – passed a revised enrollment ordinance, which "empowered members

- 15 -

of the Executive Committee to add or delete names from the Tribal rolls...." (ECF No. 1 at 8). Plaintiffs allege that Defendants made a determination that Margarita Britten was not a full-blooded Pala Indian. *See id.* at 5-6, 15-16, 36-38. Plaintiffs allege that Defendants disenrolled Plaintiffs, who are descendants of Britten, on the grounds that Plaintiffs lacked the requisite blood quantum for tribal membership. *See id.* Plaintiffs allege that "Defendants, as members of Pala's Executive Committee, were in positions of power and control over members of the Tribe." *Id.* at 16. Plaintiffs seek compensatory and punitive damages from Defendants for allegedly conspiring to wrongfully disenroll Plaintiffs. Plaintiffs seek a permanent injunction "to invalidate Defendants' wrongful enrollment actions" as well as declaratory relief, "declaring the wrongful disenrollment ... to be null and void" and in "violation of their civil rights." *Id.* at 62.

Based upon the "essential nature and effect" of the injunctive and declaratory relief sought in the Complaint, the Court finds that the Pala Tribe is the "real, substantial party in interest" in this case. *Maxwell*, 2013 WL 542756 at *11. Only the Pala Tribe, whose sovereign immunity is unquestioned, could satisfy the relief sought in the Complaint, i.e. the reinstatement of Plaintiffs as members of the Tribe. Defendants, as members of the Executive and Enrollment Committees, "possess the power" to grant Plaintiffs that relief "on behalf of the tribe." *Id.* Accordingly, the Court finds that this action, as alleged, is fundamentally one against the Pala Tribe and that Plaintiffs have sued the individual Defendants in their official capacities.

Although Plaintiffs challenge the motives and the findings of the Committee's individual members, the Complaint alleges that the Committee, acting as a governing body, disenrolled Plaintiffs. "Without more, it is difficult to view the suit against the officials as anything other than a suit against the Band." *Imperial Granite Co.*, 940 F. 2d at 1272 ("The votes individually have no legal effect; it is the official action of the Band, following the votes, that caused Imperial's alleged injury."); *see also Maxwell*, 2013 WL 542756 at *12 ("Holding the defendants [in *Hardin*] liable for their legislative functions would ... have attacked the very core of tribal sovereignty."). However, unlike *Imperial Granite*, Plaintiffs in this case have

alleged that the revised enrollment ordinance, which confers disenrollment authority to the Executive Committee, is unconstitutional and that Defendants acted in excess of their statutory authority.[4]

"It is true that officer's suits have been permitted in the past when 'the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional.'" *Shermoen*, 982 F.2d at 1320 (quoting *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 690 (1949)). However, "a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." *Larson*, 337 U.S. at 691 n.11.

The Court finds that the relief sought in this Complaint would "require affirmative action by the sovereign," i.e. the Pala Tribe's re-enrollment of Plaintiffs. *Larson*, 337 U.S. at 691 n.11. Such a remedy would operate against the Pala Tribe, impermissibly infringing upon its sovereign immunity. *See generally Lewis v. Norton*, 424 F.3d 959 (9th Cir. 2005) ("Courts have held that tribal immunity bars suits to force tribes to comply with their membership provisions, as well as suits to force tribes to change their membership provisions."(citations omitted)); *Santa Clara Pueblo*, 436 U.S. at 72 n.32 ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community.... Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters."); *Imperial Granite Co.*, 940 F. 2d at 1272 ("[A] tribe's immunity is not defeated by an allegation that it acted beyond its powers."). Based upon the factual allegations of the Complaint and the nature and effect

---

[4]Plaintiffs allege that the revised constitution was never properly adopted, and that, as a result, the original articles of incorporation are still in effect. Plaintiffs allege that under the articles of incorporation, Defendants would not have been authorized to disenroll Plaintiffs. This issue is currently before the Bureau of Indian Affairs. *See Aguayo v. Salazar*, No. 12-CV-551-WQH (S.D. Cal. Nov. 19, 2012) (order dismissing complaint for failing to allege the existence of a final agency action that is subject to review under the APA).

of the relief sought, the Court concludes that Defendants acted in their official capacities and within the scope of their authority when they made the membership determinations at issue in this case.

## CONCLUSION

Pala is a separate sovereign and, based upon the factual allegations of the Complaint and the relief requested, its Tribe enjoys immunity that extends to the Defendants named in this case. Congress has not authorized this action and Plaintiffs have failed to adequately allege that the Tribe has waived its immunity. This action must be dismissed. *See Kiowa Tribe of Okla.*, 523 U.S. at 754 ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.").

IT IS HEREBY ORDERED that the Amended Motion to Dismiss (ECF No. 17) filed by Defendants is GRANTED. The Complaint is dismissed on the basis of sovereign immunity.

DATED:  March 11, 2013

**WILLIAM Q. HAYES**
United States District Judge